**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

In re                :   Chapter 11
                 :
MBM ENTERTAINMENT, LLC,    :   Case Nos. 14-10991 through
MBM DEVELOPMENT, LLC, and    :     14-10993 (MEW)
ALTRIA DEVELOPMENT, LLC,    :
                 :   (Jointly Administered)
          Debtors.  :

-------------------------------------------------------------x

JANINA Y. DAVIS,         :
                 :
         Plaintiff,  :
      v.         :   Adv. Pro. No. 14-02231 (MEW)
                 :
M&M DEVELOPER, LLC, MOUSSA   :
YEROUSHALMI, MORAD YEROUSHALMI, :
FARZANEH YEROUSHALMI and ALTRIA :
DEVELOPMENT, LLC,      :
                 :
        Defendants. :

-------------------------------------------------------------x

JANINA Y. DAVIS,         :
                 :
         Plaintiff,  :
                 :
      v.         :   Adv. Pro. No. 14-02386 (MEW)
                 :
M&M DEVELOPER, LLC, MOUSSA   :
YEROUSHALMI, MORAD YEROUSHALMI, :
FARZANAH YEROUSHALMI, and MBM  :
DEVELOPMENT, LLC,      :
                 :
        Defendants. :

-------------------------------------------------------------x

JANINA Y. DAVIS,         :
                 :
         Plaintiff,  :
      v.         :   Adv. Pro. No. 15-01086 (MEW)
                 :
M&M DEVELOPER, LLC, MOUSSA   :
YEROUSHALMI, MORAD YEROUSHALMI, :
FARZANEH YEROUSHALMI, MBM   :
DEVELOPMENT, LLC and MBM    :
ENTERTAINMENT, LLC,      :
                 :
        Defendants. :

-------------------------------------------------------------x

A P P E A R A N C E S :

ROBINSON BROG LEINWAND GREENE
  GENOVESE & GLUCK PC
*Counsel for the Debtors*
    By:    Fred B. Ringel, Esq.
875 Third Avenue
New York, NY 10022

A.R. SOLEIL & COMPANY, P.C.
*Counsel for Plaintiff Janina Y. Davis*
    By:    Andre R. Soleil, Esq.
167 Park Avenue
Brooklyn, NY 11205

## **MEMORANDUM OPINION**

The Debtors in these procedurally consolidated cases are MBM Entertainment LLC

("**MBM Entertainment**"), MBM Development LLC ("**MBM Development**") and Altria

Development LLC ("**Altria**").    Each Debtor is the current record owner of real property formerly

owned by Janina Y. Davis ("**Davis**").    On May 8, 2015 this Court completed a two week trial of

various long-running disputes between Davis, the three Debtors and the Debtors' owners and

affiliate.    Davis claims primarily that the properties were obtained by fraud, conversion or other

wrongful act and should be deemed subject to a constructive trust or other equitable interest in her

favor, or that the transfers of the properties should be rescinded and her ownership should be

restored.    She has asserted alternative claims seeking damages for fraud, breach of contract or

unjust enrichment.    Defendants claim that Davis misrepresented facts about the properties and

breached contracts, and during trial they contended that Davis had wrongly taken possession of

space at one of the properties beginning in 2012.

2

Just prior to trial, Davis attempted to amend her pleadings to assert additional claims.    In addition, during the trial each side attempted to pursue claims or counterclaims that were not mentioned in the pleadings.    The Court's rulings on those matters are summarized in Part III of this Opinion.    The fact that the claims and counterclaims included claims by and against various individuals and entities who are related to the Debtors also requires careful consideration of the scope of this Court's jurisdiction and its ability to render final decisions, and those issues are discussed in Part IV.

At trial, the parties presented evidence as to more than 20 separate contracts and instruments.    Many of the contracts have unclear or contradictory terms, and some were sham agreements that were never intended to have any effect.    The parties differed as to the interpretation and enforceability of nearly every one of the contracts and instruments in evidence, and Davis denied that she had signed some of them.    Each side accused the other of fraud, and at different times each side asked the Court to enforce alleged oral agreements and understandings in lieu of the written documents the parties signed.    Davis also alleged that she had signed some agreements and instruments under physical or economic duress.    The immense number of disputes between the parties requires extensive findings of fact that are set forth in Part V of this Opinion.

For the reasons set forth herein, the Court has concluded as follows:

(1)    The Court has jurisdiction over the claims and counterclaims and the ability to render final decisions with respect to them;

(2)    There is no merit to Davis's motion to dismiss these Chapter 11 cases;

3

(3)      Davis's claims for the imposition of a constructive trust, or the imposition

of an equitable lien, or for a rescission of the transfers of the properties are without merit

for a variety of factual and legal reasons;

(4)      There is no merit to Davis's claims of fraud, duress, or forgery;

(5)      Defendants owe a remaining contract obligation to Davis in the amount of

$435,000, for which Altria and its affiliate, M&M Developer, LLC, should be jointly and

severally liable;

(6)      Altria is entitled to damages of $74,100 from Davis through and including

May 31, 2015 plus an additional $5,700 per month for each month from and after June 1,

2015 until Davis relinquishes full possession and control of all units in the Clinton Property

(as that term is defined below) to Altria;

(7)      Farzaneh Yeroushalmi and Morad Yeroushalmi jointly are entitled to a

damage claim against Davis in the amount of $121,600; and

(8)      There is no merit to the other counterclaims asserted by Defendants.

The Court will enter a separate Order directing the parties to address issues relating to the

computation of prejudgment interest on the outstanding claims, which the parties have not

previously addressed, and those issues will be resolved before judgment is entered.

## I.      The Parties and Other Relevant Individuals

Prior to May 2005 Davis owned property located at 139 Clinton Avenue in Brooklyn, New

York (the "**Clinton Property**"), property located at 187 Gates Avenue in Brooklyn, New York

(the "**Gates Property**") and property located at 148 West 127th Street in Manhattan (the "**Harlem**

**Property**").   Altria is currently the record owner of the Clinton Property; MBM Development is

currently the record owner of the Gates Property; and MBM Entertainment is currently the record owner of the Harlem Property.

The Defendants at trial included Moussa Yeroushalmi ("**Moussa**"), Farzaneh Yeroushalmi ("**Farzaneh**") and Morad Yeroushalmi ("**Morad**") (collectively, the "**Yeroushalmis**"). Farzaneh is Moussa's wife, and Morad is Moussa's brother.   The Yeroushalmis reside in Great Neck, Long Island.   The three Debtors, and a non-Debtor limited liability company named M&M Developer, LLC ("**M&M**"), also were Defendants at trial.   One or more of the Yeroushalmis owned, controlled and acted on behalf of M&M as well as each of the three Debtors at all times relevant to this Opinion.

Two other individuals figure prominently in the parties' narratives, though they were not parties to the proceedings before the Court.   One is an individual who was identified at various times during the trial as Eric McGill, Aswad Ayinde, Arune Destula, Baku, or some combination or variation of those names; the parties most frequently referred to him as "**Baku**" and that shorthand is adopted here.   Davis formerly had a romantic relationship with Baku, and the Defendants also had business relationships of various kinds with Baku.   The other individual is Subhana Rahim ("**Rahim**").   Davis acquired the Gates Property from Baku and Rahim (who had previously owned the Gates Property as tenants in common), and Rahim was a plaintiff in a lawsuit against Davis and others relating to that transaction.

## II.    Procedural Background

Davis filed three lawsuits in the New York State courts on July 9, 2007.   One lawsuit (Adversary Proceeding No. 14-02231) relates to the Clinton Property; it names Altria, M&M, Moussa, Farzaneh and Morad as defendants.   The second lawsuit (Adversary Proceeding No.

14-02386) relates to the Gates Property; it names MBM Development, M&M, Moussa, Morad and Farzaneh as defendants.   A third lawsuit (Adversary Proceeding No.15-01086) relates to the Harlem Property; this lawsuit names MBM Development, MBM Entertainment, M&M, Moussa, Morad and Farzaneh as defendants.

Davis's primary contention in her complaints in the three state court lawsuits is that the Defendants obtained the Clinton Property, the Gates Property and the Harlem Property by fraud or other wrongful act.   Davis contends that each property should be deemed subject to a constructive trust or other equitable lien in her favor, and/or that the transfers of the properties should be rescinded and her ownership restored.   She also alleges claims for breach of contract and unjust enrichment, and seeks damages to the extent that the equitable relief she seeks is not granted. Defendants filed counterclaims, alleging that Davis made false representations and warranties with respect to the properties and breached the parties' contracts.

The Debtors filed voluntary Chapter 11 petitions on April 8, 2014.   Judge Gropper entered an Order directing the Joint Administration of the three cases on May 1, 2014.

In July 2014 Davis removed two of her three state court lawsuits to this Court on the ground that they were "related to" the pending Chapter 11 cases.   The Notices of Removal of the lawsuits relating to the Clinton Property and the Gates Property were filed on July 1, 2014, and after a series of transfers those lawsuits were referred to this Court on August 18, 2014.   The Notices of Removal stated that Davis consented to this Court's entry of a final judgment with respect to all of the removed claims and counterclaims.

On August 14, 2014, Davis also filed proofs of claim against Altria, MBM Development and MBM Entertainment.   *See* Defendants' Trial Exhibits LL, MM and NN.   Davis's proof of

6

claim against Altria attached a copy of the complaint in the state court lawsuit relating to the

Clinton Property; her claim against MBM Development attached a copy of the complaint in the

lawsuit relating to the Gates Property; and her claim against MBM Entertainment attached a copy

of the complaint in the state court lawsuit relating to the Harlem Property.   Davis thereby

incorporated all of her claims against the Debtors in all three of the state court lawsuits into her

proofs of claim against the Debtors in these cases.

On August 29, 2014, the Debtors filed a proposed Joint Plan of Liquidation [Dkt. 20][1] and

a proposed Disclosure Statement [Dkt. 23]; amendments were filed on December 19, 2014.   The

amended plan contemplates sales of the Clinton Property, the Gates Property and the Harlem

Property and the distribution of the sales proceeds to mortgagees and other creditors in order of

priority.   Davis filed an objection to the proposed Disclosure Statement on October 22, 2014.

[Dkt. 28].   In her objection, Davis contended that it would be premature and improper to approve

and circulate the Disclosure Statement, or to consider confirmation, until the Court had first

resolved Davis's competing contentions as to the proper ownership of the Clinton Property, the

Gates Property and the Harlem Property.   However, Davis took no action at that time to prosecute

her claims in the two lawsuits that had been removed to this Court or in the third lawsuit that

remained pending in the state court.

Judge Gropper held a hearing to consider the proposed amended disclosure statement on

December 23, 2014, and issued an Order dated January 8, 2015.   Judge Gropper concluded,

---

[1]    The three bankruptcy cases (14-10991, 14-10992 and 14-10993) are jointly administered, with
all submissions docketed only in the lead case (no. 14-10991).   References to docket entries
in the bankruptcy cases will be set forth as [Dkt. #].   With respect to the adversary
proceedings (14-2231, 14-2286 and 15-1086), identical submission of the relevant documents
were made in each.   For convenience, the Court will only refer to the docket entry numbers in
adversary proceeding 14-2386 as [Adv. Dkt. #].

among other things, that "an expedited determination of Ms. Davis' claims would best serve the interests of all parties."   Accordingly, he scheduled a conference for February 11, 2015, directed the parties to complete any further necessary discovery on or before that date, and ordered that "the parties should be ready to go to trial immediately after that date."   [Dkt. 42]

On January 26, 2015 Davis filed a Notice of Removal for the state court action relating to the Harlem Property; that lawsuit was referred to this Court on March 13, 2015.   The Notice of Removal for this lawsuit did not contain the statement required by Rule 9027(a)(1) as to whether the removed claims and counterclaims were "core" or "non-core," or as to whether Davis consented to a final resolution of those matters by this Court.   *See* Fed. R. Bankr. P. 9027(a)(1). However, Davis removed the action for the express purpose of consolidating it for trial with the actions that had previously been removed, as to which she had previously consented to a final decision by this Court.   In fact, Davis's claims with respect to the Harlem Property arose from the same April 19, 2005 contract as her claims with respect to the Gates Property, and the parties' claims and counterclaims with respect to those two properties were inextricably intertwined. Davis also had attached the Complaint in this lawsuit to her proof of claim against MBM Entertainment and thereby had submitted all of those claims to the jurisdiction of this Court. Davis's counsel also acknowledged during the final pretrial conference that Davis had previously consented to the final decision by this Court of all of the removed claims and counterclaims.

Following Judge Gropper's retirement from the bench, the parties appeared before Judge Garrity for a further conference.   On March 5, 2015, Judge Garrity approved the proposed disclosure statement and scheduled a hearing to consider confirmation of the Debtors' proposed plan of reorganization.   [Dkt. 59].   Judge Garrity also approved a schedule that permitted some

8

limited additional discovery to be completed and that scheduled a trial of the parties' claims and counterclaims to coincide with the confirmation hearing.   This Court entered a scheduling order that memorialized Judge Garrity's rulings on March 6, 2015, and approved a consensual modification of the scheduling Order on March 9, 2015.   [Adv. Dkt. 7 and 8].

On March 26, 2015, the Debtors filed a motion seeking summary judgment [Adv. Dkt. 9]; the Court denied the motion in an Order dated March 31, 2015.   [Adv. Dkt. 12].

On March 31, 2015, Davis filed a "Note of Issue" with a purported jury demand.   [Adv. Dkt. 13]   In addition, on April 10, 2015, only 6 days before the final Pretrial conference, Davis filed a "cross-motion" asking the Court to permit Davis to amend her pleadings and to dismiss the Chapter 11 cases as allegedly having been filed in bad faith.   [Adv. Dkt. 17].   Davis's papers also stated (for the first time) that Davis believed that this Court lacked the ability to render a final judgment on some of her claims.   [Adv. Dkt. 17]   As noted above, however, Davis's counsel acknowledged during the final pretrial conference that Davis had previously consented to the final decision by this Court of all of the removed claims and counterclaims in all three actions.   On April 17, 2015, this Court entered an Order that:   (1) consolidated the hearing on Davis's motion to dismiss the Chapter 11 cases with the confirmation hearing, the trial of the adversary proceedings and the trial of Davis's proofs of claim; (2) struck Davis's jury demand as untimely; (3) denied the request for permission to make a late jury demand; (4) denied permission to amend the complaints in the three adversary proceedings; (5) granted limited permission, to Davis, to make a belated designation of an expert witness on handwriting issues; and (6) made preliminary determinations as to the scope of this Court's jurisdiction and its ability to render final decisions on the parties' claims and counterclaims. [Adv. Dkt. 21].

The parties submitted their final Joint Pretrial Order on April 14, 2015.   [Adv. Dkt. 22].
The Joint Pretrial Order includes a number of stipulated facts along with descriptions of the
parties' contentions, lists of exhibits and designations of witnesses.   Trial began on April 27, 2014
and concluded with closing arguments on May 8, 2015.

### III.    The Claims and Counterclaims at Trial

The parties sought to prove various claims and counterclaims at trial that went beyond
those set forth in their prior pleadings, and also made contentions that contradicted statements
made in the prior pleadings.   The Court made a number of rulings concerning the claims,
counterclaims and issues to be decided.

### A.    Forgery Claims

In her Complaints in the state court lawsuits, Davis alleged that she had "executed" deeds
relating to the Gates Property and the Harlem Property on or about May 6, 2005.   *See* Complaints
attached to Defendants' Exhibits LL (¶ 14) and NN (¶ 14).   In a pretrial motion, Davis sought
permission to amend her pleadings to contend that she had never actually signed these deeds or
certain other documents.   This Court ruled on April 17, 2014 that, with the exception of certain
documents that had only recently been produced by Defendants, the "forgery" claims were matters
of which Davis had to be aware at a previous time and that Davis could and should have made such
contentions earlier if she wished to pursue them.   However, the Court ruled that Davis would be
permitted to testify about alleged forgeries at trial in connection with the resolution of the parties'
contract claims and counterclaims, with the Court reserving the right to exclude such testimony (or
to disregard it) to the extent that it was contrary to Davis's prior pleadings.   The same issue arose
several times during trial; the Court adhered to the prior rulings, and Davis ultimately contended

that six documents that contained her purported signature had never actually been signed by her.

Those contentions are discussed in Part V, below.

### B.    Alleged Duress

In her pretrial motion, Davis also sought to amend her complaints to assert that she had

been the subject of beatings by Baku, that she suffered from battered woman syndrome and that

some of the transactions between Davis and the Defendants had been procured by duress.    The

issue arose several more times during trial.    The Court ruled (both with respect to the pretrial

motion and with respect to the issues that arose during trial) that the pleadings did not allege

"duress" or any other circumstance that affected or altered Davis's ability to enter into contracts of

her own free will, and that Davis could not be allowed to assert the "duress" claims at such a late

date.    The Court noted that the Defendants had prepared the case for trial based on the existing

pleadings and discovery had been closed, and it was too late to permit the duress claims to be

asserted.    However, the Court ruled that Davis would be allowed to introduce evidence of

"duress" with respect to her execution of documents that had only recently been produced by the

Defendants.    The Court also ruled that Davis would be allowed to introduce evidence of duress to

the extent that she could show that the Defendants were aware of, or encouraged, the conduct that

constituted such duress.    The Court reasoned that it would be unfairly prejudicial to require the

Defendants to litigate claims of "duress" that allegedly affected Davis's capacity to enter into a

contract in the abstract (without any knowledge or participation by the Defendants), but that the

Defendants were present for trial and there would be no similar prejudice to the extent that Davis

contended that the Defendants themselves knew of such duress and accepted or encouraged it.

11

Davis ultimately contended that certain agreements had been obtained by duress and that Defendants allegedly knew of that duress, and those contentions are discussed in Part V.

### C.        Unconscionability

Davis sought, by pretrial motion, to amend her pleadings to contend that the parties' contracts could not be enforced because they were unconscionable.   The Court denied the last-minute motion to amend the pleadings to include such contentions, holding that it was too late to amend the pleadings to assert such new contentions.   However, the Court ruled that Davis's contentions that the contracts "were unconscionable," or that they made no sense as they were being interpreted by the Defendants, would be taken into consideration to the extent that they bore on contractual interpretation issues or to the extent that they supported Davis's contentions that the Defendants must have made other fraudulent statements (extraneous to the contracts) to induce Davis to execute the contracts.   Issues relating to the fairness (or unconscionability) of the contracts also were considered at trial in connection with Davis's requests for imposition of a constructive trust.   Ultimately the ruling as to the pleadings on this point did not affect the evidence that was offered at trial or the contentions made by Davis's counsel.

### D.        Counterclaims for Wrongful Occupancy

During trial, Defendants contended that Davis had obtained re-entry to the Clinton Property in 2012, had taken up residence in a duplex apartment (without paying rent) and had rented apartments to other tenants in the name of Altria, without turning over rents to Altria. Defendants made contentions about these events during opening statements; Davis's counsel then questioned Moussa about these issues; and Defendants then asked additional questions on cross-examination of Moussa.   On the fourth day of trial, when Defendants' counsel returned to

12

these issues, Davis objected for the first time that these claims had not been asserted in the

Defendants' counterclaims and that it would be improper to consider them.   However, after

discussion of Rule 15(b)(2) of the Federal Rules of Civil Procedure, made applicable by Rule 7015

of the Federal Rules of Bankruptcy Procedure, Davis's counsel agreed that in light of the prior

testimony at trial (to which no objections had been offered) the Court was required to treat the

Defendants' counterclaims as though they had been amended to include these claims.

> **E.    Alter Ego Contentions**

At trial, Davis contended at several points that the Debtors and M&M had no separate

corporate existence and that each should be liable for the obligations of the others and for whatever

obligations the Yeroushalmis owe to Davis.   Defendants did not concede any of these points but

did not object when Davis offered evidence on such issues or when Davis made arguments about

these points.   The Court will treat these issues as being part of Davis's pleadings pursuant to Fed.

R. Bankr. P. 7015 and Fed. R. Civ. P. 15(b)(2).

## IV.    The Court's Jurisdiction and Power to Issue Final Decisions

This Court has jurisdiction and may render final decisions to the extent specified in 28

U.S.C. § 157, subject to any additional limits that are imposed by Article III of the United States

Constitution.   *See Stern v. Marshall*,   564 U.S. __, ___,131 S. Ct. 2594, 2609 (2011).   In turn,

Section 157 differentiates between "core" and "non-core" matters.   "Non-core" matters include

issues that are "related to" a debtor's case but do not "arise in" the bankruptcy case and do not

"arise under" the Bankruptcy Code.   *See* 28 U.S.C. §§ 157(c), 1334(b).   The scope of the Court's

"related to" jurisdiction is very broad and encompasses any matter that could affect the Debtors'

estates.   *See In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 114 (2d Cir. 1992) (To determine

13

whether there is "related to" jurisdiction, the test is whether the outcome of the litigation "might have any 'conceivable effect' on the bankrupt estate" or any "significant connection with the bankruptcy estate" (citing *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. l984), and *In re Turner*, 724 F.2d 338, 341 (2d. Cir. 1983)).

Section 157 of Title 28 permits this Court to issue final decisions on "core" matters, subject only to limitations imposed by Article III.   Section 157(c) also permits a bankruptcy court to issue final decisions on non-core matters (including matters that are "related to" the bankruptcy cases) with the parties' consent.   It provides that:

> (1) A bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11.   In such proceeding, the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected.

> (2) Notwithstanding the provisions of paragraph (1) of this subsection, the district court, with the consent of all the parties to the proceeding, may refer a proceeding related to a case under title 11 to a bankruptcy judge to hear and determine and to enter appropriate orders and judgments, subject to review under section 158 of this title.

*See* 28 U.S.C. § 157(c).

The United States Supreme Court ruled yesterday that "consent" is a sufficient basis to permit a final adjudication by this Court.   *See Wellness Int' Network, Ltd. v. Sharif,* No. 13-935 (U.S. May 26, 2015); *see also Executive Benefits Ins. Agency v. Arkison*, 573 U.S. ___ (2014). This ruling is consistent with prior Supreme Court rulings regarding Magistrate Judges, and with prior decisions in this District.   *See Roell v. Withrow*, 538 U.S. 580, 582, 586-88 (2003) (approving final decisions by magistrate judges upon parties' consent and inferring such consent from parties' conduct during litigation); *see also Coudert Brothers LLP v. Baker & McKenzie LLP*

14

*(In re Coudert Brothers LLP)*, 2011 WL 5593147, *10-12 (S.D.N.Y. Sept. 23, 2011) (concluding

that parties may consent to entry of final judgment by bankruptcy courts); *In re Oldco M Corp*.,

494 B.R. 598 (Bankr. S.D.N.Y. 2012) (same, and finding that a default constituted such consent);

*In re N.Y. Skyline, Inc.*, 512 B.R. 159, 172, 175-76 (S.D.N.Y. 2014) (recognizing that bankruptcy

court can enter final judgment on non-core matter with consent of parties).

Davis filed proofs of claim that incorporated all of her claims against the Debtors and made

those "core" matters for resolution by this Court.   Davis also agreed, when she removed the state

court actions to this Court, that all of the claims and counterclaims in those lawsuits were "related

to" the Debtors' Chapter 11 cases.   She also consented to the final adjudication of those claims

and counterclaims by this Court.   The Defendants have also stated their agreement that all of the

parties' claims and counterclaims are "related to" the Debtors' Chapter 11 cases, and they too have

consented to the final adjudication of such claims by this Court.   *See* Joint Pretrial Order at 6.   To

the extent that new issues (outside the original pleadings) were the subject of trial and therefore

have been deemed to be part of the pleadings pursuant to Fed. R. Civ P. 15(b)(2), the parties tried

those issues without objection and therefore with consent to their resolution by this Court.   *Roell,*

538 U. S. at 585.

However, "consent" is only sufficient to the extent that claims and counterclaims are

"related to" the Chapter 11 cases.   The parties' prior agreements that "related to" jurisdiction

exists are significant (and may preclude the parties from complaining about an exercise of

jurisdiction), but it is still appropriate for this Court to consider the extent to which various matters

are "related to" these Chapter 11 cases and therefore the extent to which this Court has subject

matter jurisdiction over them.

Determining the extent to which claims and counterclaims are "related to" these Chapter 11 cases is made somewhat difficult by the parties' general tendency (in their pleadings and other papers) to refer to claims "against" the Defendants generally or to counterclaims "by" the Defendants generally, without differentiating among the various individuals and entities. However, the Court concludes that the principles described above lead to the following conclusions as to the Court's jurisdiction and its ability to render final judgments:

### A.    Davis's Proofs of Claim, Objections to Confirmation and Motion to Dismiss

Davis's proofs of claim (which incorporate all of her claims against the Debtors in the adversary proceedings), Davis's objections to confirmation of the Debtors' proposed plans of reorganization, and her motion to dismiss the Chapter 11 cases on grounds of "bad faith," are plainly within this Court's "core" jurisdiction.   *See* 28 U.S.C. § 157(b)(2)(A), (B), (L), (N) and (O); *Gulf States Exploration Co. v. Manville Forest Prods. Corp. (In re Manville Forest Prods. Corp.)*, 896 F.2d 1384, 1390 (2d Cir. 1990) (noting that "[t]he determination of the objection to and allowance of [a party's] claim is clearly within the traditional core jurisdiction of the bankruptcy court"); *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 84 n. 36 (1982) (noting that "bankruptcy adjudications themselves, as well as the manner in which the rights of debtors and creditors are adjusted, are matters of federal law"); *Langenkamp v. Culp*, 498 U.S. 42, 45 (1990) (by filing proof of claim, one submits to bankruptcy court jurisdiction); *Stern*, 131 S.Ct. at 2618 (noting that "the question is whether the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process"); *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 31, 58 (1989) (noting that to waive right to jury trial on an issue, it must be part of "the process of allowance and disallowance of claims" or "integral to

16

the restructuring of debtor-creditor relations").    No party has contended otherwise, and no party

has challenged this Court's Constitutional power to resolve those matters on a final basis.

### B.        Davis's Fraud and Rescission Claims Against Non-Debtors

Davis has asserted fraud and rescission claims against non-Debtor M&M and against the

Yeroushalmis individually.    However, Davis does not allege any "fraud" that is separate from the

fraud that allegedly negates the Debtors' ownership of the properties; indeed, her primary

allegation of constructive trust is that the Debtors obtained the properties through fraudulent acts

committed by the non-Debtor Defendants, in which (Davis contends) the Debtors joined or for

which the Debtors otherwise should be held jointly and severally responsible.    Those allegations

of fraud must be resolved in order to resolve the Debtors' property rights, and so they are plainly

"related to" the Chapter 11 cases.    Similarly, to the extent that Davis contends that she is entitled

to a rescission of the underlying property transfers, and a return of the properties that she once

owned, those claims affect the Debtors' assets directly and are "related to" the Chapter 11 cases.

Furthermore, Davis argued at trial that the separate existence of the Debtors and of M&M should

be ignored and that each should be treated as having full responsibility for the obligations of the

others and for whatever obligations the Yeroushalmis may owe to Davis.    In each of these ways,

the fraud and constructive claims against the non-Debtors overlap with and are "related to" the

same claims that have been made against the Debtors.

### C.        Davis's Claims for Money Damages Against Non-Debtors

Davis has also asserted other claims for money damages (including breach of contract and

unjust enrichment claims) against all of the Defendants, including the Debtors.    It is conceivable

that Davis could have had damage claims against non-Debtor Defendants that might not directly

17

affect the Debtors.    For example, Davis contends that her April 2005 contracts with M&M

contemplated the formation of the Debtors, but the Debtors were not named as parties to those

contracts and did not exist at the time the contracts were executed.    However, as noted above,

Davis contended at trial that the Debtors either joined in or otherwise should be held responsible

for the frauds and other wrongdoings committed by non-Debtor Defendants.    Davis also argued

that the separate existence of the Debtors and of M&M should be ignored and that each should be

treated as having full responsibility for the obligations of the others and for whatever obligations

the Yeroushalmis may owe to Davis.    At various other points Davis suggested more generally that

the Defendants share "joint and several liability" for all of the wrongs she alleged.    Those

contentions establish that all of Davis's claims are "related to" the Chapter 11 Debtors and the

pending Chapter 11 cases.

### D.    The Debtors' Contractual Counterclaims Against Davis

The state court actions also include counterclaims by the Debtors against Davis.    These

are "core" matters as defined in Section 157(b)(2)(C).    As a Constitutional matter, they may be

finally resolved by this Court to the extent that they involve facts that must also be decided in the

course of resolving Davis's proofs of claim.    *See Stern*, 131 S. Ct. at 2616-18.    This test is

satisfied to the extent that the Debtors assert counterclaims that arise out of the same contracts that

form the basis of Davis's claims.    Davis's proofs of claim (and her contentions as to the "net"

amounts owed to her under her alternative claims for damages) cannot be computed without a full

resolution of the parties' contentions about their respective obligations to each other and their prior

payments to each other.    (Whether Davis has contractual counterclaims against the Debtors, and

whether the Debtors have contractual counterclaims, is a separate issue addressed below.)

18

Alternatively, even if "core" jurisdiction over the Debtors' counterclaims did not exist,

there would be "related to" jurisdiction (as they plainly affect the Debtors) and the Court would

have the ability to issue a final decision by virtue of the parties' consent.

### E.    Non-Debtors' Contractual Counterclaims Against Davis

Davis does not appear to distinguish among the Defendants for purposes of her contracts;

as noted above, she has argued (on various theories) that all of the Defendants share joint and

several responsibility under all of the parties' contracts.   Defendants, for their part, have not been

precise in identifying which contractual counterclaim(s) belong to which Defendants.   At times

they suggest that M&M owns the contractual counterclaims relating to Davis's April 2005

agreements, or that certain obligations owed to Davis are owed solely by M&M.   However, for

the most part Defendants argue generally that Davis owes damages to the Defendants and that

these should be paid or offset against any claims that she has against the Defendants collectively.

*See* Joint Pretrial Order at p. 4.   Given the Defendants' inconsistent arguments on these points,

and Davis's contentions that all of the Defendants' obligations should be treated as obligations of

the Debtors, the Court holds that the non-Debtors' counterclaims for damages are "related to" the

Debtors' cases (and to Davis's claims against the Debtors themselves), and that the Court has the

power to issue a final judgment on those claims by virtue of the parties' consent.

### F.    Altria's Counterclaim for Occupancy of the Clinton Property

Altria's counterclaims for occupancy of the Clinton Property after 2012 are not matters that

need to be decided in the context of Davis's proofs of claim.   However, such claims do "relate to"

Altria's Chapter 11 case in that (a) they require resolution of Altria's and Davis's respective

property rights to the Clinton Property, and (b) their resolution affects the assets of the estate.   *See*

*Celotex Corp. v. Edwards*, 514 U.S. 300, 308 (1995) (noting that the jurisdictional grant under 28

U.S.C. § 1334(b) was broader than previous Acts, which already had afforded jurisdiction to

matters related to "property of the debtor").    The parties have consented to the resolution of such

claims by this Court, either explicitly (through their prior statements) or implicitly (by trial of the

claims pursuant to Fed. R. Civ. P. 15(b)(2)).

### G.    Non-Debtors' Counterclaims for Occupancy of the Clinton Property

The Defendants contend that Davis has improperly taken up residence in a building owned

by Altria (without paying rent) and that Davis has improperly rented other units in the name of

Altria, while diverting those rents to her own use and benefit.    As noted above, those claims

plainly "affect" Altria to the extent that Altria owns the claims, and this Court has "related to"

jurisdiction over them.    However, it is not clear that Altria owns all of the relevant claims.    The

alleged wrongful occupancy began in 2012, at a time when the record ownership of the property

belonged to Morad and Farzaneh.    Record ownership was not transferred back to Altria until

March 26, 2014.    Defendants have contended, however, that Altria always had beneficial

ownership of the Clinton Property and that the property had been put in the names of Morad and

Farzaneh for the sole purpose of facilitating a mortgage loan.    In addition, Davis has contended

that for purposes of resolving the parties' respective rights and obligations the Court should

disregard the separate existence of Altria.    The Court holds that it has "related to" jurisdiction

over the counterclaims, even to the extent it might ultimately be determined (after trial) that some

part of the counterclaims belongs to Morad and Farzaneh rather than Altria.

20

V.      **Findings of Fact**

The Court has carefully considered the parties' stipulations, the exhibits in evidence and the testimony of the witnesses, and makes the following findings of fact:

A.      **Background Facts**

1.      Moussa and Morad are partners in a variety of ventures that include real estate development.   From time to time Farzaneh participates, as a member, in some of the ventures organized by Moussa and Morad.   However, Farzaneh testified credibly that Moussa had a power of attorney to sign her name, and that Moussa usually made business decisions on her behalf.

2.      The Operating Agreement of M&M was not offered as evidence.   There was testimony by Moussa that Farzaneh and Morad were the members of M&M.   However, it is plain from the evidence that Moussa and Morad jointly owned, controlled and acted for M&M during the times relevant to the disputes before this Court.   All of the important documents relevant to these cases were signed on M&M's behalf either by Moussa or Morad, or sometimes both.

3.      Moussa testified credibly that prior to 2005 he had been involved in real estate development projects for many years, including large commercial projects as well as some residential development projects.

4.      Moussa and Morad first met Baku some time prior to 2005.   They were introduced by Rabbi Browd, who thought Moussa and Morad might be able to help Baku finance various ventures in which Baku was interested.   One such potential venture was "Hip Pop Beverages," a potential soda bottling business.

5.      Davis is a graduate of Howard University (with a degree in economics) and is a former fashion model.   She had considerable success during the 1990s but her modeling career had either ended, or had significantly declined, by the mid-2000s.

6.      Davis acquired the Clinton Property in 1998.   It is a four-story building with four units.   Davis managed the Clinton Property and rented some units in the building to other tenants.

7.      Beginning in 2002 and continuing until June 2006, Davis was in a romantic relationship with Baku.   They had one child together: a girl (Altria) who was born in 2003.

8.      At some time, Baku also had a relationship with Rahim.   At various times during the trial Rahim was referred to as Baku's former wife, and at other times as his unmarried companion; the difference is not material to the issues before the Court.   It is also not clear whether Baku's relationship with Rahim continued during all or part of the period of his relationship with Davis, but that question also is not material to the issues before the Court.

9.      In October 2003, Davis acquired the Gates Property from Baku and Rahim, who had owned the Gates Property as tenants in common.   The deed was recorded in January 2004. *See* Defendants' Exhibit JJ.   Davis testified that she paid approximately $670,000 for the Gates Property.   Davis testified that she borrowed the entire purchase price for the Gates Property through a mortgage loan on the property.

10.      The stipulated exhibits included a copy of a separate contract of sale executed by Davis in July 2004, in which she agreed to sell the Gates Property to Jaleelah Rahim for a price of $833,000, of which $660,747 would be paid through assumption of the existing mortgage. Apparently this sale was never accomplished, however, and neither party referred to this contract during the trial or explained its inclusion among the stipulated exhibits.

22

11.     Davis represented that the amount of the outstanding mortgage loan was $752,000 as of April 2005.   *See* Defendants' Exhibit A.   There was no testimony as to the reason why the amount had increased, or as to how the proceeds from the increased mortgage had been used.

12.     The Gates Property was habitable when Davis acquired it in October 2003.   The building had four units.   Davis testified that she agreed that Rahim could continue to occupy an apartment at the Gates Property after Davis acquired that property.

13.     Davis acquired the Harlem Property in February 2004 for approximately $500,000. Davis testified that she borrowed all but $10,000 or $15,000 of the purchase price.   Davis represented that the amount of the mortgage loan was $490,223.87 as of April 2005.

14.     At the time of the purchase the Harlem Property was not habitable.   It required a complete rebuilding of all but basic elements of the framing and foundation of the building.

15.     Moussa testified that he was informed by both Baku and Davis, in early 2005, that Baku (not Davis) was the real beneficial owner of the Gates Property and the Harlem Property. Davis denied this at trial.   However, Davis's prior affidavit in the state court (Defendants' Exhibit PP) included allegations that Baku had "used" Davis's superior credit to cause Davis to acquire the Gates Property and the Harlem Property for the benefit of Baku.   Davis stated as follows in paragraphs 7 through 9 of that affidavit:

> 7.     The beginning of my economic downfall began after I met Arune Destula a/k/a/ Baku Aswad Ayinde who is not a named Defendant.
>
> 8.     It was Arune Destula, who got me to purchase 187 Gates Avenue, Brooklyn, a property which initially belonged to his Wife.   He also got me to purchase 148 West 127th Street, a property which was owned by a friend of his.
>
> 9.     These two properties had been threatened with foreclosure and Arune Destula used me and my credit to save them for himself and for his wife.

23

Davis also testified at trial that she first learned of the Harlem Property by a broker in Manhattan. However, Moussa testified that Baku had identified the Harlem Property as a location for a potential business venture.   The Court finds the contentions in Davis's prior Affidavit, and in Moussa's testimony on this point, to be credible.   The Court finds that Davis used her own credit to obtain the necessary mortgage loans, but that she acquired and held the Gates Property and the Harlem Property primarily at the instigation of, and for the benefit of, Baku.

16.     In October 2004, Rahim filed suit (the "**Rahim Action**") against Baku, Davis and other parties, alleging that Davis had acquired the Gates Property by fraud or through other wrongful conduct.   *See* Index No. 31765/04 (N.Y. Sup. Ct., Kings Co.).[2]

17.     In October 2004 Rahim filed a *lis pendens* to inform potential transferees of the pendency of the Rahim Action.

18.     On December 13, 2004, the New York State Supreme Court entered an Order that restrained any transfer of the Gates Property by Davis during the pendency of the Rahim Action, except that Davis was permitted to refinance the mortgage on the property.

19.     Davis's ownership of the three properties was causing financial strains by early 2005.   At that time, the monthly mortgage payments on the three properties were approximately $16,000 in the aggregate; Davis testified that overall monthly carrying costs exceeded $20,000 per month.   The Harlem Property generated no rents.   Although the Gates Property generated rental income, Davis did not receive that income during the pendency of the Rahim Action.   The Clinton

---

[2]     Rahim's counsel in her lawsuit against Davis was Andre Soleil.   In a curious development, Soleil acted as counsel to Davis in the trial before this Court, and Rahim joined Soleil at the counsel table.   Soleil's entry of an appearance on behalf of Davis preceded the date when this Court took over the cases.   No party objected to the representation at trial and the Court did not inquire further into the circumstances.

Property generated income that Davis estimated at $5,000 to $5,500 per month, but that fell far short of the overall expenses for the properties.   Baku also was engaged in demolition and other work with respect to the Harlem Property, using further resources.   Davis was not then working as a model and these expenses were eating into her savings.

20.    Davis and Baku spoke to Moussa and Morad on several occasions beginning in early 2005 about the possibility of working together to develop the Gates Property, the Harlem Property and the Clinton Property.   Their discussions led to the execution of an agreement dated April 19, 2005 with respect to the Gates Property and the Harlem Property (the "**April 19 Agreement**") and an agreement dated April 20, 2005 with respect to the Clinton Property (the "**April 20 Agreement**").

**B.    The April 19 Agreement**

21.    Multiple copies of the April 19 Agreement were executed and two were introduced into evidence, as Plaintiff's Exhibit 20 and as Defendant's Exhibit A.   Some differences appear in the alignment of the initials and the alignment of a handwritten addition to the two copies of the agreement, but the text appears to be the same with one minor difference that is noted below.

22.    The introductory paragraph to the April 19 Agreement defines Baku and M&M as the "Parties."   Davis is a signatory to the April 19 Agreement but she is not defined as a Party.

23.    Paragraph 11 of the April 19 Agreement says that the agreement contains the full agreement of the parties and supersedes any other agreements or understandings.   Paragraph 15 states that the agreement is governed by New York law.

25

24.    The April 19 Agreement recites that Davis is the record owner of the Gates

Property and the Harlem Property.   It also recites that M&M and Baku desired to enter into a

partnership to take title to the properties and to develop them.

25.    Paragraph 5 of the April 19 Agreement called for Davis to transfer title to the Gates

Property and the Harlem Property to a "Joint Partnership."   M&M was to be permitted to

investigate title issues prior to any such transfer, and M&M had the option to withdraw from the

agreement (and to render the agreement void) if M&M did not like what it found.

26.    Davis represented in paragraph 6 of the April 19 Agreement that she had full power

and authority to "consummate the transaction provided for herein" and that the consummation of

the contemplated transaction would not violate "any judgment, order right, injunction or decree"

issued against or imposed upon the Gates Property and the Harlem Property.   Davis also

represented and warranted that there were no pending litigations with respect to Davis and the

properties.   These representations and warranties were false in light of the pendency of the Rahim

Action and the order entered therein that barred a transfer of the Gates Property.

27.    Davis further represented in paragraph 6 of the April 19 Agreement that there were

no "assessments" pending or threatened against her or against the two properties.   This

representation and warranty was false because Davis and her properties were subject to a federal

tax judgment and lien, though Davis expected the tax lien to be resolved without significant cost.

28.    Davis testified that she disclosed the Rahim Action and the IRS lien orally, prior to

the time the April 19 Agreement was executed.   However, Davis also testified that she read the

April 19 Agreement before she signed it and that she recognized that the written representations

and warranties were inaccurate in light of the Rahim Action and the IRS lien.   Her testimony that

26

she simply elected not to clarify those statements is inconsistent with the fact that she insisted that

other provisions of the agreement be modified (as described below) to reflect terms that were more

consistent with her understanding of the parties' agreements.

29.     The typewritten form of agreement stated that Davis would transfer the deeds to the

Joint Partnership for "no consideration."   *See* Plaintiff's Exhibit 20, ¶ 5.   It also stated that

$150,000 would be paid to Baku, and that "Janina agrees and understands that she shall not be

entitled to any compensation whatsoever from M&M and/or the Joint Partnership."   *Id*. ¶ 8.

However, a handwritten addition on the last page of the agreement states:

> We would pay Janina Y. Davis $150,000.00 as follows:[3]
>
>> at the Transfer of the deed $50,000.00
>> 60 days after the deed Transfer additional $50,000.00
>> 120 days after the deed Transfer additional $50,000.00
>
>> All checks would be certified funds or cashier check.

"We" is not defined but in the context of other agreements and the actions of the parties it plainly is

a reference to M&M.   In addition, the plain intent and effect of the handwritten comment was to

supersede the statement that Davis would receive no consideration for the transfer of the

properties.   The parties have stipulated that this was the effect of the handwritten modification,

*see* Joint Pretrial Order, Stipulations 21 and 22, and the witnesses at trial each confirmed these

conclusions.

30.     Paragraph 2 of the April 19 Agreement states that Davis would bear the Carrying

Costs (including mortgage payments) until transfer of the deeds for the Gates Property and the

---

[3]     The quoted language is from Plaintiff's Exhibit 20.   The handwriting on Defendant's Exhibit
A says "following" instead of "as follows" but is essentially the same.

Harlem Property.    Other paragraphs in the April 19 Agreement contain inconsistent terms

regarding the obligation to pay the mortgage and other carrying costs after the deeds were

transferred.    Paragraph 5 says that after transfer the notes and mortgages shall continue to be the

"sole responsibility" of Davis.    However, Paragraph 7 says that Baku (not Davis) will pay all

Carrying Costs, including debt service, after the transfer of the deeds and until certain

Improvements are completed, at which point the "Joint Partnership" will pay the Carrying Costs.

A handwritten sentence that appears at the end of paragraph 7 then says:

> Both M&M & Baku are responsible for the Mortgages on the property and
> should Guarantee & make and agree to indemnify and Hold Harmless from
> and against any loss, cost, damages, liability or expense arising out of or in
> connection with any nonpayment of Janina's Mortgages.    The Joint Venture
> has the same responsibility against Janina.

The Court finds that this handwritten notation, like the handwritten notation as to the

compensation to be paid to Davis, was intended to modify and to override the typed text.

Furthermore, the Court finds that Davis was the person to be "held harmless" by M&M, Baku and

the Joint Venture with respect to the Mortgages; that is the only interpretation that is consistent

with the statement that M&M & Baku are responsible for the Mortgages, and with the later

statement that the "Joint Venture" has the same indemnification responsibility "against Janina."

The Court further finds that the purpose of this handwritten addition was to clarify that it was

M&M and Baku, collectively – and not Davis – who had the responsibility for all mortgage

payments for the Gates Property and the Harlem Property once the deeds were transferred.    This

interpretation is also consistent with the actions of the parties, including most prominently a

separate agreement that M&M executed with Baku on May 6, 2005, under which Baku made

provision for the payment of the mortgages for the Gates Property and the Harlem Property after

May 6, 2005 by agreeing that $25,000 could be held aside for that purpose out of payments to which Baku otherwise would have been entitled.   *See* Part V(F), below.

31.   Moussa testified at trial that the handwritten language regarding mortgage payments was only intended to specify the parties' respective obligations <u>after</u> Improvements had been completed, and that Davis retained the obligation to make mortgage payments for both properties unless and until Baku finished Improvements to the Harlem Property.   The Court does not find this explanation to be credible or consistent with the language used in the April 19 Agreement.   It is true that the handwriting appears after a sentence that describes the joint ownership of the properties once certain Improvements are completed, but it also appears at the end of a paragraph that more generally describes the responsibilities for payments of the Carrying Costs during the entire period in which the properties are owned by the "Joint Partnership." Furthermore, the typed text already specified that the Joint Venture would pay "Carrying Costs" after the completion of certain Improvements; if the handwritten notation meant only what Moussa contended, there would have been no need for it.   The plain intent of the language used, and in particular its reference to an indemnification, was to provide assurance to a third person other than M&M and Baku (namely, Davis) that she would have no continuing responsibility for the mortgage payments following the transfer of the deeds.   Defendants' contrary interpretation of this language – under which Davis would have been obligated to repay mortgages of $1.24 million for an indefinite period after transferring the properties to someone else (and possibly to pay them in full), despite receiving only $150,000 in consideration – makes no sense.

32.   The April 19 Agreement also states that Baku and M&M would be partners in the partnership that was contemplated by the agreement, and that no other partner could be admitted to

the partnership without the consent of all of the partners.   *Id*. ¶¶ 7, 10.   Davis testified at trial that

she read the agreement before she signed it, that she noticed this language and that she asked

questions about it.   She also testified that she believed that she (not Baku) would have a 50%

interest in the partnership that would develop the Gates Property and the Harlem Property.   At

times Davis testified generally that this was her "understanding"; at other times she said that

Moussa had assured her that she would "automatically" be a 50% partner because she was

transferring the properties to the partnership.   This testimony is contrary to the merger clause in

the April 19 Agreement, which states that all of the parties' agreements are incorporated in the

writing.   Furthermore, the Court finds that Davis's testimony on this issue is not credible.   Davis

admitted that she read the agreement before signing it and that she understood that the written

terms did not call for her to be a partner.   She showed that she was capable of obtaining

handwritten modifications to other provisions of the April 19 Agreement that were not to her

liking.   Her testimony (if it were to be believed) is that she read the agreement; knew that by its

terms it made Baku (not Davis) a partner; believed that to be wrong and contrary to her desires;

asked that other provisions (regarding compensation to her) be modified in writing; but that she

nevertheless made no request for a similar modification or clarification of the "partnership"

provisions of the agreement before signing it.   The Court does not believe that such an

implausible sequence of events occurred.   Furthermore, Davis did sign a separate agreement with

M&M on April 20 for the Clinton Property (described below), as to which Davis was to be the

"partner" in a development partnership.   If that had similarly been the intent and agreement with

respect to the Gates Property and the Harlem Property, that is what the April 19 Agreement would

have said.

33.      In addition, the Court is not aware of any assertion by Davis, in any document that

predates the filing of the state court complaints, to the effect that she believed she was an owner of

a partnership that held the Gates Property and the Harlem Property.    Her contentions in this regard

are contradicted by her later actions and are not credible for those additional reasons.

34.      Davis's attorney contended at trial that Davis must have believed she would be a

partner in the Joint Partnership for the Gates Property and the Harlem Property, because otherwise

it would not have made sense for her to enter into the April 19 Agreement.    However, Davis

admitted that she acquired the Gates Property and the Harlem property for an out-of-pocket cash

investment of only $10,000 to $15,000.    That out-of-pocket investment was increased by the

monthly carrying costs for the properties, but offset by whatever rents she collected (and possibly

by the proceeds of increases in the mortgage loans on the properties).    Neither party offered an

accounting of those sums.    On the whole, the evidence at trial gave me no reason to believe that a

payment of $150,000 for Davis's interests (with her mortgage payments to end upon a transfer of

the deeds) was unreasonable or unconscionable, particularly as it offered her relief from the

financial stresses she was facing.    Similarly, although Davis made general statements that she

thought the Gates Property and the Harlem Property were much more valuable than the April 19

Agreement reflected, she offered no evidence to that effect, or as to how much the value of the

properties might then have exceeded the outstanding mortgages, if at all.

### C.    The April 20 Agreement

35.      Multiple copies of the April 20 Agreement were executed, and two copies were

introduced into evidence, one as Plaintiff's Exhibit 12 and another as Defendants' Exhibit F.    The

signatures appear slightly different on the two versions, and the alignment of some of the

handwriting differs, but otherwise the two copies are the same.

36.     Paragraph 10 of the April 20 Agreement states that it sets forth the full agreement of

the parties and supersedes any prior agreement or understanding.   Paragraph 14 states that the

agreement is to be governed by New York law.

37.     The introductory paragraph to the April 20 Agreement defines Davis and M&M as

the "Parties."   The April 20 Agreement recites that Davis is the record owner of the Clinton

Property and that M&M and Davis desire to enter into a partnership to take title and to develop the

property "into the maximum allowable per code condominium dwelling and as approved by the

applicable governing New York City building authority (hereinafter referred to as the 'Project')."

38.     Paragraph 3 of the April 20 Agreement called for Davis to transfer title to the

Clinton Property to the contemplated "Joint Partnership" in exchange for the consideration

specified in the agreement.   However, M&M was to be permitted to investigate title issues prior to

any such transfer, and M&M had the option to withdraw from the agreement (and to render the

agreement void) if M&M did not like the results of the title search.

39.     Davis represented and warranted, in paragraph 4 of the April 20 Agreement, that

there were no "assessments" pending or threatened with respect to Davis or with respect to the

Clinton Property.   This representation and warranty was not correct in light of the federal tax

judgment and lien to which Davis and her properties were subject, though Davis expected she

would be able to resolve the tax lien without significant cost.

40.     Paragraph 7(A) of the April 20 Agreement provided that "[u]nder the Joint

Partnership, throughout the Project and upon its conclusion," each Party would be entitled to 50%

32

of the "Net Proceeds" from any sale or lease.   "Net Proceeds" was defined as "the proceeds

remaining after any and all costs, expenses, and indebtedness" for the relevant portion of the

property, including the payment of fees to a construction company (an affiliate of M&M) and

reimbursement of all construction costs.   Paragraph 6 further provides that M&M would

"advance" a total of $700,000 to Davis "against Janina's Fifty (50.0%) Percent of Net Proceeds,"

on the following schedule:   (a) $100,000 upon "transfer of legal title of the Property to the Joint

Partnership;" (b) $200,000 after renovation plans were approved and construction financing was

obtained; (c) $200,000 when renovations were half completed; and (d) $200,000 upon final

completion of the Project.

41.     Paragraph 2 of the April 20 Agreement states that Davis would bear the Carrying

Costs (including mortgage payments) until transfer of the deed for the Clinton Property.

Paragraph 3 states that after transfer of the deed the "note and the indebtedness secured by the

mortgage against the Property shall remain Janina's sole responsibility."   Paragraph 5 then states

as follows:

> At all times subsequent to the transfer of title, with ownership of the Property
> held by the Joint Partnership, and throughout the Project and upon its
> conclusion, Janina shall remain responsible for payment of all the Carrying
> Costs of the Property, including but not limited *[sic]* the cost of refinancing
> said mortgage and the debt service of a similar debt subsequent to such
> refinance.   By contrast, M&M shall be responsible to advance payment of all
> expenses in connection with the Project, including but not limited to obtaining
> construction loan, soil testing, survey, etc. ("Construction Costs") on behalf of
> the Joint Partnership.

It is not entirely clear from the foregoing language, viewed in isolation, whether Davis's ongoing

"responsibility" for the "payment" of the mortgage and other Carrying Costs was merely an

obligation to advance those sums during the course of the Project (just as M&M was to "advance"

payment of other expenses), or whether Davis alone was to bear the full economic burden of all

33

such Carrying Costs, without recovering those amounts from gross proceeds and without any contribution by her partner.   However, the definition of "Net Proceeds" in paragraph 7(A) of the April 20 Agreement contemplates that "indebtedness" will first be recovered from proceeds before "Net Proceeds" are divided – just as Construction Costs are reimbursed from proceeds before "Net Proceeds" are divided.   This language suggests that amounts advanced for mortgages and other debts are to be recovered and reimbursed before "Net Proceeds" are divided.   Moussa confirmed this understanding at trial.   Moussa initially was unable to provide a clear answer when asked (after being given an example by the Court) to explain how "Net Proceeds" would be divided: his initial answer plainly included a double-counting of the mortgage debts and was corrected by his counsel.   Ultimately, however, Moussa acknowledged that the relevant provisions in the April 20 Agreement meant that the parties would share "Net Proceeds" after mortgages, construction costs and other expenses, which meant (effectively) that one way or the other M&M would share one-half of any mortgage payments paid by Davis, and Davis would ultimately share one-half of any Construction Costs paid by M&M.   The Court finds that this interpretation of the language in paragraphs 3 and 5 is the correct interpretation and that Davis's "responsibility" was to advance mortgage payments (not to bear the sole ultimate burden of the mortgages).

42.    Paragraph 7 of the April 20 Agreement clearly gave M&M exclusive power to control the conduct and management of the Project through a "Construction Corp." that would be owned by M&M.   It also provided that M&M would "exclusively" make decisions regarding the Property, including financing, renting or selling the Property or portions thereof.   Paragraph 7(F) also stated that the "Joint Partnership" would "keep adequate books and records at its place of business, setting forth a true and accurate account of all business transactions arising out of and in

34

connection with the conduct of the Joint Partnership."   The Parties also agreed that no additional

partners would be admitted (and no partnership interests could be transferred) without the "written

unanimous vote or consent" of all of the Parties.

### D.   Title Reports

43.   Title reports and further investigations regarding the Clinton Property, the Gates

Property and the Harlem Property disclosed three issues after the April 19 Agreement and the

April 20 Agreement were signed.   First, the Rahim Action was underway, and the New York

State Court had stayed any transfer of the Gates Property until that action was completed.

Second, the Internal Revenue Service had placed a lien on Clinton as a result of unresolved tax

disputes with Davis.   Third, various uncured violations were outstanding, though there was no

evidence at trial that the violations were of any material importance.

44.   Davis testified that she disclosed the Rahim Action and the IRS tax lien to Moussa

and Morad prior to signing the April 19 Agreement and the April 20 Agreement, and that the other

violations were minor issues that did not deserve mention.   Moussa and Morad denied any

knowledge of these issues until after the two agreements were signed.   The Court finds the

testimony of Moussa and Morad to be more credible than Davis's testimony on this point,

particularly since the existence of these issues prompted the parties to execute certain amendments

to their agreements (as described below).   If Davis had previously disclosed these matters, they

would have been mentioned in the agreements and/or there would have been no reason for the

amendments that the parties agreed to on May 6 to address these issues.

45.   Moussa and Morad had the right to declare the April 19 Agreement and the April 20

Agreement void, but they elected not to do so.   Instead, they elected to proceed with the

transactions, subject to certain modifications to the agreed terms.    At least eight separate

documents dated May 6, 2005 were then executed.    In an effort to avoid confusion the Court will

identify them here and provide shorthand references to each of them as follows: (a) an agreement

(the "**May 6 Davis Agreement**") between M&M and Davis that related to payments owed to

Davis; (b) an agreement (the "**May 6 Baku Agreement**") between M&M and Baku that related to

payments owed to Baku; (c) a deed for the transfer of the Gates Property, together with a separate

transfer tax form for that property; (d) a deed for the transfer of the Harlem Property, together with

a separate transfer tax form for that property; (e) a letter agreement (the "**May 6 Indemnity**")

addressed to Moussa and Morad and signed by Baku and Davis, that related (among other things)

to title defects as to the properties; and (f) a contract for the sale of the Clinton Property by Davis to

Altria (the "**May 6 Altria Contract of Sale**").

### E.    The May 6 Davis Agreement

46.    M&M and Davis (but not Baku) were parties to the May 6 Davis Agreement.    *See*

Plaintiff's Exhibit 13.    The May 6 Davis Agreement references the Clinton Property and the April

20 Agreement, but it also plainly refers to issues regarding the Gates Property as well (which was

the subject of the April 19 Agreement).    The agreement was drafted by Moussa and the parties'

best recollection is that it was signed at Moussa's offices in Great Neck.

47.    The May 6 Davis Agreement refers to "issues of less pendence on the above

referenced property" and to "the pending lawsuit" as to the Gates Property.    "Less pendence"

presumably is a reference to a "lis pendens;" the only "lis pendens" of which evidence was

provided was the Notice of Pendency in the Gates Litigation.    However, Moussa and Davis

testified that "less pendence" referred to the IRS tax lien, so the Court adopts that interpretation.

48.    As explained above, the April 19 Agreement provided for a payment of $50,000 to Davis upon a transfer of deeds to the Gates Property and the Harlem Property, with another $100,000 to be paid within 120 days thereafter; the April 20 Agreement provided for an advance (to Davis) of $100,000 upon the transfer of the deed to the Clinton Property.    M&M and Davis agreed in the May 6 Davis Agreement that one-half of the total $150,000 due at transfer of the three deeds would be "put on hold" until the two issues mentioned in the May 6 Agreement were resolved.    Of the remaining $75,000, one payment of $20,000 was made to Davis's mother (Eutha Davis), and another payment of $10,000 was made to 139 Clinton Ave. Co., a company apparently owned by Davis.    Davis acknowledged at trial that these payments were for her benefit and should be treated just as though they had been paid directly to her.    Another $1,549 was designated as payment for "Other fees Corporate & Legal."    The amount of $15,000 was described as "Two months advance mortgage of 139 Clinton Ave."; there is no evidence in the record of these payments being made to Davis herself and apparently they contemplated payments to be made directly to the holders of the mortgages.    Finally, the May 6 Davis Agreement stated that the balance of $28,451 would "stay in the account until JV made a request for transfer for her use or payment of mortgages."    It is not clear whether the reference to "JV" was a mistaken reference to "JD" (meaning Janina Davis) or whether "JV" was intended to refer to one of the contemplated Joint Partnerships (with "JV" standing for "Joint Venture").    The agreement was silent as to which particular mortgages were the subject of the holdback or the precise circumstances under which the holdback could be released.    However, as described in Part V(L), the parties ultimately agreed to a full accounting of these and other sums, so the ambiguity as to this particular item is of no consequence.

37

### F.    The May 6 Baku Agreement

49.    M&M and Baku executed a separate agreement dated May 6, 2005 that related to

the payments owed to Baku under the April 19 Agreement.   *See* Plaintiff's Exhibit 22.   As noted

above, Baku was entitled to an initial payment of $50,000 under the April 19 Agreement, plus

another $100,000 as various milestones were reached.   The May 6 Baku Agreement

acknowledged that Baku had been paid $6,500 in advance and that $1,549.00 would be charged to

Baku for "corporate and legal" fees.   As to the remainder, the parties agreed to hold $25,000 in a

separate account for mortgage payments, and to pay the balance of $17,951.00 to Baku.

### G.    The May 6 Deeds for the Gates Property and the Harlem Property

50.    The evidence at trial includes copies of two deeds dated May 6, 2005, one relating

to the Gates Property and other relating to the Harlem Property, along with real property transfer

tax forms for each property.   *See* Defendants' Exhibits B and C.   In each case the deed reflects a

transfer of ownership from Davis to MBM Development.   The real property transfer tax forms

attached to each deed stated that the transfers were mere changes in the form of ownership and not

in the beneficial ownership of the properties.   Those statements were plainly wrong: there was an

ownership change, which either was a complete change in ownership (if Davis had no interest in

MBM Development and the Joint Partnership) or a partial change in beneficial ownership (if, as

Davis contended, Davis herself was to have a continuing ownership interest).   However, as in

other instances described in this Opinion, it appears that the parties to this trial were not victims of

any such misstatement, but instead were complicit in it.

51.    MBM Development is a Nevada limited liability company that was formed after

the execution of the April 19 Agreement.   The parties agreed that the initials "MBM" in the name

of this entity were derived from the names Moussa, Baku and Morad.    Davis alleged in her

complaints that MBM Development was not qualified to do business in New York, and

Defendants denied this allegation.    *See* Defendant's Exhibits LL, ¶5; NN, ¶5; JJJ, ¶5; and KKK,

¶5.    However, no party offered evidence on this issue at trial.

   52.  At trial, Davis testified that she never signed the deeds for the Gates Property, the

Harlem Property or the transfer tax forms; these were four of the six documents that she contended

she never signed, though they purport to bear her signature.    The Court did not find Davis's

testimony to be credible.    Davis repeatedly testified that she did not sign the deeds because she

"could not" have done so in light of the Rahim Action and the IRS lien, each of which needed to be

cleared up.    In context, however, her testimony amounted to little more than statements that she

did not remember signing the deeds and did not believe she would have done so; it was not credible

evidence of actual forgery.    More importantly, Davis's testimony at trial on these points was flatly

contrary to her pleadings, her prior statements, and testimony by other witnesses.    First, Davis

acknowledged in her state court complaints that she had actually signed the deeds on May 6, 2005

and had transferred the properties.    *See* Defendant's Exhibit LL, ¶ 14; Defendant's Exhibit NN, ¶

14.    Second, Davis submitted an affidavit in the state court lawsuits in which she acknowledged

that she had signed the deeds for the Gates Property and the Harlem Property and that she had done

so notwithstanding the pendency of the Rahim Action and the orders entered therein.    *See*

Defendant's Exhibit PP, ¶ 19.    Third, David Pour (counsel to Defendants) notarized Davis's

signature to each of the two deeds, and he testified at trial that Davis signed the deeds in his

presence.    Fourth, Defendants offered the testimony of a handwriting expert (Peter V. Tytell) who

testified credibly that in his opinion the signatures on the original deeds and transfer tax forms

were Davis's signature, with a confidence level that was close to a virtual certainty.   Even Davis's

counsel acknowledged during his closing argument that Tytell's testimony was credible.

53.    Davis's accusations of forgery also are not consistent with her conduct.   She

testified at trial that she never transferred the Gates Property and the Harlem Property.   However,

she received payments that were attributable (in part) to the April 19 Agreement, and she was not

entitled to payments under that agreement unless and until she transferred the deeds.   Davis also

acknowledged that someone else was paying the mortgages, real property taxes, water and sewer

charges, and other costs for the Harlem Property and the Gates Property after May 2005, and that

she became aware of construction work going on at the two properties that she herself had never

arranged.   When asked to explain how her financial responsibilities could have ended if she still

owned the properties, and how someone else could be working on the properties if she still owned

them, she could only say that she was confused at that time.   The Court does not credit that

explanation.   Davis's actions are not consistent with her contention that she believed that she

continued to own the properties.

54.    Defendants raised a separate issue as to whether Davis continued to be responsible

for the mortgages on the Gates Property and the Harlem Property after May 6, 2005.   As noted

above, Davis's obligations to pay the mortgages for the Gates Property and the Harlem Property

continued until the "transfer" of the deeds to the "Joint Partnership."   At trial, Defendants

contended that MBM Development was merely a "Holding Entity" (a characterization used in

another document that is described below) and was not itself the "Joint Partnership" contemplated

by the April 19 Agreement.   The evidence at trial showed that Baku was not a member of MBM

Development.   However, regardless of whether MBM Development was *itself* the Joint

Partnership, or whether the Joint Partnership was merely a reference to the overall relationship

created by the April 19 Agreement (to which MBM Development was either a member or an

adjunct), M&M itself treated the transfers of the deeds to MBM Development as transfers that

entitled Davis to the initial payments specified in the April 19 Agreement.   Those payments were

only due upon transfer "to" the Joint Partnership, and accordingly the Court finds that the transfers

of the Harlem Property and the Gates Property to MBM Development were transfers "to" the Joint

Partnership for purposes of the April 19 Agreement.

55.    The evidence at trial further showed that the deeds to the Gates Property and the

Harlem Property were not actually submitted for recording until September 20, 2005, and were not

recorded until October 2005.   *See* Defendants' Exhibits B and C.   The witnesses did not recall

the circumstances clearly but believed that the recording must have been postponed until after

certain issues were resolved in the Rahim Action (as described below).   This explanation is

credible and it is the only explanation that accounts for the delay.

56.    There was no testimony as to whether the parties intended that the execution of the

deeds would trigger the obligations set forth in the April 19 Agreement, or whether the "transfer"

would be deemed to occur only when the deeds were recorded.   The parties' actions were

inconsistent on this point.   On the one hand, the parties treated the execution of the deeds as an

action that triggered the payments due under the April 19 Agreement (though some of those

payments were held back).   That makes sense, since the deeds themselves effected the transfers of

the property; the recording merely provided notice of those transfers to other persons, *see Goodell

v. Rosetti*, 52 A.D.3d 911, 913 (App. Div. 3d Dept. 2008), and the Court finds that this occurred on

May 6, 2005.   On the other hand, the parties apparently agreed in the May 6 Davis Agreement that

41

some portion of the amounts payable to Davis would be held back to cover unspecified mortgage

obligations; Davis testified that she believed this was with respect to the Gates Property and the

Harlem Property.   The better view is that the transfers occurred on May 6, 2005.   Notably, the

limited backup information in evidence for the accounting that the parties made in September 2005

included references to certain mortgage payments for the Clinton Property but did not refer to any

payments with respect to the Gates Property and the Harlem Property, even though Defendants had

made those mortgage payments.   *See* Defendants' Exhibits L and T.   The Court finds that the

transfers were effective when the deeds were executed and delivered on May 6, 2005 and that

Davis's obligations with respect to the mortgages for the Gates Property and the Harlem Property

ended on that date.

### H.      The May 6 Indemnity

57.      Davis and Baku executed the May 6 Indemnity.   *See* Defendant's Exhibit I.   The

May 6 Indemnity was drafted by M&M's counsel, David Pour.   Davis's signature on the

document was notarized by Pour.

58.      The May 6 Indemnity referred to the "transfer" of the Clinton Property, the Gates

Property and the Harlem Property to MBM Development and to Altria (identified in the May 6

Indemnity as the "Holding Entities") pursuant to the terms of the April 19 Agreement, the April 20

Agreement and the May 6 Agreement.   However, the Clinton Property had not been transferred as

of May 6, 2005; the parties agree that the transfer of the Clinton Property did not take place until

August 15, 2005.   While there are good reasons to suspect that the May 6 Indemnity may have

been back-dated, the parties have stipulated that it was signed on May 6, 2005, and so the Court

will accept that stipulated fact.   *See* Joint Pretrial Order, Stipulation 39.

42

59.     In the May 6 Indemnity, Davis and Baku acknowledged that the Clinton Property, the Gates Property and the Harlem Property had been transferred "for good value and consideration" and had been made "voluntarily and independently, with adequate consultation of our attorney."   They further acknowledged "severe defects in title" as to each property, and assumed "full responsibility" for payments required to satisfy the same.   They also indemnified Moussa, Morad and the Holding Entities against losses and costs incurred in connection with such defects in title.

## I.     The May 6 Altria Sale Agreement and the August 15 Closing

60.     Altria is a Nevada limited liability company that was formed after the execution of the April 20 Agreement.   The parties agreed that the name "Altria" in the name of this entity is a reference to Davis's daughter.   Davis alleged in her complaints that Altria was not qualified to do business in New York, and Defendants denied this allegation.   *See* Defendant's Exhibit MM, ¶ 5; Defendant's Exhibit KKK, ¶ 5.   However, no party offered evidence on this issue at trial.

61.     The most bizarre set of agreements and instruments submitted in evidence were those relating to a contract of sale dated May 6, 2005 (through which Davis purportedly agreed to sell the Clinton Property to Altria for $2.2 million) and other documents relating to a purported closing of this transaction on August 15, 2005.   *See* Defendant's Exhibit H.   Moussa testified that the entire "sale" was a sham, and that Moussa and Morad concealed that fact from David Pour (the counsel who prepared the documents and administered the closing) and Jeanette Sommo (the title company representative who handled the closing).   Moussa and/or Morad procured two bank checks, in the total amount of $900,000, that were made out in favor of Davis and that purportedly were delivered to Davis at the closing as her share of the sale proceeds after mortgages and other

43

expenses were paid.   However, the checks were never delivered to Davis.   Instead, they were

redeposited in the Yeroushalmis' accounts, having been endorsed as "not used for purposes

intended."   *See* Plaintiff's Exhibits 45 and 46.

62.    Davis contends that she did not sign the May 6 sale contract for the Clinton

Property, and Defendants admit they did not produce this document to Davis until shortly before

trial.   This was the fifth of the six documents that purported to bear her signature but that Davis

believed she never signed.   However, Defendants' handwriting expert testified that the signature

belonged to Davis.   The Court finds the expert's testimony to be credible, although since no party

seeks to enforce the May 6 sale agreement (and all parties concede it was a sham) it makes little

difference whether Davis signed it or not.

63.    The sale agreement provided that the two mortgages on the Clinton Property would

be assumed by Altria, but there is no indication in the record before me of whether the lenders were

advised of this term or whether they were a victim of any deception in connection with the

purported sale agreement.

64.    One of the documents that was executed at the closing was a deed that transferred

the Clinton Property to Altria.   Curiously, the parties agree that the sale agreement was of no

effect, but at the same time they acknowledge that the deed was effective to transfer the Clinton

Property to Altria.   No party has urged that the deed be undone by virtue of having been part of a

closing of an otherwise "sham" sale.   Instead, both parties urged that the deed be treated as a

transfer pursuant to the terms of the April 20 Agreement.

65.    The execution of a fake sale agreement, and the conduct of a fake closing (with

misrepresentations to counsel and to a title company as to what was happening), are very troubling.

44

Even more troubling is the suggestion that Defendants may have attempted to use the fake closing

in their efforts, in 2013, to evict Davis from the Clinton Property.    (Davis's occupancy of an

apartment in the Clinton Property is described below.)    The exhibits in evidence include an

affidavit from David Pour, the attorney for Defendants who arranged the August 15, 2005 closing,

to the effect that Davis had sold the Clinton Property outright to Altria in August 2005.    *See*

Defendants' Exhibit MMM.    That affidavit was submitted to the Civil Court where the eviction

action was pending.    Given their testimony at trial, Moussa and Morad had to be aware, in 2013,

that the August 15 closing was a sham.

66.    The reasons for the fake sale are unclear.    Moussa testified that Davis was in

financial trouble and wanted to engage in a phony transaction that might protect the transfer of the

Clinton Property against subsequent attacks by Davis's creditors, and that the Defendants went

along with her desires.    There was some evidence that Davis was experiencing financial strains in

August 2005.    The trial exhibits included an undated list of credit debts that Davis owed, which

amounted to $216,200.    *See* Defendants' Exhibit U.    Davis acknowledged that the handwriting

on this document was hers.    The exhibit indicated that the "last payments" on each debt had been

made in July 2005, suggesting that the debts existed as of August 2005 and that the exhibit was

prepared in August 2005 or thereafter.

67.    Nevertheless the Court does not find Moussa's testimony about the origins of the

May 6 Altria Sale Agreement, and the purposes of the fake closing, to be credible.    If Davis faced

potential problems with her creditors, then it is far more likely that the Defendants (not Davis)

were concerned about the possibility that the property would be transferred and that renovations

would proceed, only to have the transfers undone at a later date and to have the property returned

45

to Davis for the benefit of her creditors.    Furthermore, the notion that a sham "sale" might have

fooled Davis's creditors is preposterous.    Any creditor who investigated the transaction would

have quickly found that the $900,000 checks to Davis were not actually delivered to her, but

instead were redeposited into the Yeroushalmis' own accounts.

68.    The parties plainly went to considerable trouble to arrange extensive

documentation for a false transaction in August 2005.    Perhaps the goal was to disguise the nature

of the transfer and to create the appearance of a sale at an arm's-length sale price in the hope that

the "sale" price would support a high valuation of the property for the purpose of future financings.

Alternatively, the mortgages may have been assignable by Davis in connection with a sale, but less

clearly so in the context of a transfer to a joint partnership entity.    However, this is just

speculation; the reasons for the sham sale agreement are shrouded in mystery and perhaps lost to

history.    What seems clear from the evidence is that no party to this trial was a victim of deceit in

connection with the August 15 closing.    Instead, the parties were complicit in whatever deceit

they were attempting to accomplish.    While the Court finds the circumstances to be extremely

troubling, for purposes of resolving the parties' present disputes the Court will treat the August 15

deed as valid and will disregard the rest of the August 15 closing transaction.

## J.    The July 12 Agreements

69.    After May 6, but prior to the August 15 closing described above, the parties

executed two other agreements dated July 12, 2005 that further modified their relationships.

70.    One of the agreements dated July 12, 2005 (Defendant's Exhibit J) modified the

50% share of Net Proceeds to which Davis was entitled under the April 20 Agreement.    It began

with a recitation that Davis and Baku had previously agreed to share 50% of her returns, but that

46

pursuant to this agreement their sharing would be 75/25, with Davis to receive 75% of whatever

sums originally were to be paid to Davis under the April 20 Agreement.   The parties stipulated

that this agreement was signed on July 12, 2005.   *See* Joint Pretrial Order, Stipulation 40.

71.    The other agreement dated July 12, 2005 (Plaintiff's Exhibit 14) related to the

potential cost of engineering fees for an expanded building on the Clinton Property (estimated at

$250,000) and the cost of two additional elevators for that property (estimated at $300,000).

Davis and M&M agreed they would share these expenses.   Ultimately, however, none of these

planned expenses were actually incurred.

72.    Davis contended at trial that the July 12 agreements were signed shortly after she

and Baku had taken a trip to the Dominican Republic, during which time Baku assaulted her.   She

testified that Baku was detained by police in the Dominican Republic and Moussa and Morad were

informed of this fact by a cameraman who was on the trip with Davis and Baku.   Moussa and

Morad denied any knowledge of this incident.   Davis testified that she did not want to give any of

her interest to Baku, but that Moussa and Morad insisted that she had to do so.   Moussa and

Morad similarly denied that contention.

73.    The Court finds that it is likely that Baku did strike Davis while they were in the

Dominican Republic; Davis's testimony on this issue was credible.   Baku's behavior was

reprehensible and the Court takes it very seriously.   However, the evidence at trial does not permit

the Court to conclude that the July 12 agreements were executed under duress or that Davis should

be relieved from their terms.   It was not clear, at trial, just how much time passed between the

incident in the Dominican Republic and the execution of the July 12 agreements.   More

importantly, Davis testified only that she did not want to give any part of her share of Net Proceeds

47

for the Clinton Property to Baku on July 12; she did not testify that she was forced to attend the

meetings at which the agreements were signed or that she was forced to sign the agreements

themselves.    Nor did Davis repudiate the agreements in a timely way.    At later dates Davis

signed other agreements that continued to acknowledge (without complaint) that Baku owned 25%

of the one-half interest that previously belonged to Davis.    Davis also testified that she completely

ended her relationship with Baku in June 2006, more than one year before she filed her state court

lawsuits, but it was not until many years later that Davis ever contended that any of the agreements

she had signed had been procured by duress.

75. 74.    The Court also did not find sufficient evidence that Moussa or Morad were aware

of Baku's mistreatment of Davis or that they condoned, encouraged or made use of it.

### K.    The Rahim Settlement Stipulation

75.    On September 12, 2005 the parties to the Rahim Action, and one or more

representatives of M&M, entered into a Stipulation that resolved Rahim's complaints relating to

the 2003 transfer of the Gates Property to Davis.    The "subscribing parties" (which included

M&M, Davis and Baku) agreed to release all claims asserted in the action as well as "any and all

other potential causes of action before today."    However, the releases were "contingent" on the

completion of the other terms set forth in the stipulation.    *See* Defendant's Exhibit D.

76.    One term of the stipulation was that Davis would sell the Gates Property to M&M

on or before January 2, 2006 at a price "equal to the price to settle the mortgage ($752,000)."

Another term was that Rahim and Davis each would receive "an additional" $100,000 "net" from

M&M, which was to be paid on or before January 2, 2006 and simultaneous with a closing of the

sale.   A down payment of $15,000 was paid to Rahim, and the notice of pendency as to the Gates

Property was to be removed.

77.    Apparently further disputes arose between the parties and led to additional actions

by Rahim to enforce the terms of the September 12, 2005 stipulation, which resulted in an Order

dated January 25, 2006 that directed "MBM Development LLC" to make payment of the $85,000

balance with 5% interest on or before May 30, 2006.   *See* Plaintiff's Exhibit 38.   Rahim and

MBM Development entered into a further stipulation on May 15, 2006, under which Rahim agreed

to accept a payment of $86,593.76 (the balance of $85,000 plus interest) and in which Rahim

agreed to acknowledge the validity of the May 6, 2005 deed by which Davis had transferred the

Gates Property to MBM Development.   *See* Defendant's Exhibit E.

78.    There is no reference in the September 12, 2005 stipulation in the Rahim Action to

the May 6, 2005 deed.   Davis contended at trial that this was because she had not actually made

such a transfer, but the Court rejects that contention for the reasons stated above.   Moussa and

Morad said that they were not parties to the Rahim Action and did not mention the prior transfer

because Davis asked them not to do so.   The Court finds that Davis, Moussa and Morad elected

not to disclose the May 6, 2005 transfer of the Gates Property at the time of the September 12,

2005 stipulation, because they knew that the transfer was in violation of the stay order that had

previously been entered by the state court.   That is also the reason why the recording of the deed

to the Gates Property was delayed until after the stipulation in the Rahim Action was entered.

79.    The stipulation in the Rahim Action, like the May 6 Altria Sale Agreement, poses

difficult questions because the evidence at trial shows that Davis, Moussa and Morad never

intended for certain of the "agreements" in the stipulation to have any effect.   In particular,

Moussa and Morad testified that they had agreed with Davis that the reference to the $100,000

additional payment to Davis was a sham and that the only payments due would be any payments

that remained due under the April 19 Agreement.   Ordinarily the Court would not credit such

statements – in particular when they are made in an effort to undermine a court-ordered stipulation.

However, Davis herself executed a subsequent agreement on September 30, 2005 that purported to

account for (and pay) all of the remaining sums due upon the transfers of the deeds for the Gates

Property, the Harlem Property and the Clinton Property.   *See* subpart L, below.   That accounting

makes no reference to any payment due to Davis under the stipulation in the Rahim Action.   Nor

is there any evidence in the record that Davis ever sought to enforce the $100,000 payment

obligation at any time prior to the filing of her state court lawsuits.   It certainly would have been

easy for Davis to do so at the same time that Rahim enforced her own rights under the stipulation,

but that did not happen.

   80.   Davis contended at trial that the transfer of the Gates Property was in violation of

the state court order in the Rahim Action and therefore should be treated as void.   The transfer

plainly did violate the state court order, but Davis was complicit in that violation, not a victim of it.

Furthermore, the May 6 deed ultimately was disclosed to the state court, as is clear by the reference

to that deed in the May 15, 2006 stipulation that the parties executed in the Rahim Action.   The

state court did not treat the transfer to MBM Development under the May 6, 2005 deed as void;

instead, the state court approved a stipulation that recognized the transfer as valid.   The Court

cannot find that the state court's order requires it to undo the transfer of the Gates Property when

the state court itself did not do so.

81.    Davis also contended at trial that the "release" set forth in the stipulation in the Rahim Action should be interpreted as a cancellation of the April 19 Agreement, and that the Gates Property and the Harlem Property should be returned to her.    However, the Court has found that the Gates Property and the Harlem Property were transferred prior to the date of the stipulation in the Rahim Action.    In addition, Davis acknowledged that the deed for the transfer of the Clinton Property had been executed and delivered on August 15, 2005.    If the release were to be given effect as written, and if "all claims" among the parties as of September 12, 2005 were released, it could just as well be argued that all of Davis's claims against M&M, of any kind, had been canceled and replaced by the obligations set forth in the stipulation.    However, neither Davis nor M&M have urged such an interpretation of the stipulation, and such an interpretation would be contrary to all of the parties' subsequent agreements and the parties' subsequent actions.

82.    It is troubling to treat a court-ordered stipulation as though portions of it had no effect, but given the evidence submitted to the Court (including the parties' subsequent agreements and their subsequent contact) the Court has no choice but to conclude that the $100,000 payment obligation to Davis, as set forth in the September 12, 2005 stipulation, did not obligate M&M to make any additional payment to Davis beyond payments that may already have been owed to her under the April 19 Agreement and the April 20 Agreement.    Furthermore, the "release" set forth in the stipulation did not have the effect of releasing, canceling or otherwise modifying the obligations set forth in the parties' other agreements, as the parties' conduct precludes a finding that the release had any such effect.

### L.    The September 30 Agreement

83.    Davis, Baku and M&M were listed as parties to an agreement dated September 30, 2005 (the "**September 30 Agreement**") that purported to account for all of the initial sums due to Davis in connection with the transfers of the deeds.    Two copies of this agreement were introduced in evidence.    *See* Defendant's Exhibit L and Plaintiff's Exhibit 15.

84.    Davis argued at trial that she did not sign the September 30 Agreement; this was the sixth of the six documents that purported to bear her signature but that Davis denied having signed. Davis's contention is in conflict with the parties' Stipulations, which include a stipulation that "[o]n September 30, 2005, Davis, Baku and M&M agreed to amend the agreements for the respective properties . . ."    *See* Joint Pretrial Order, Stipulation 41.    In any event, the Court does not find Davis's testimony on this point to be credible.    The evidence shows that Davis received and deposited the checks for the payments specified in the September 30 Agreement.    *See* Defendant's Exhibit S at Bates-stamped pages Debtors01633-Debtors01660.    It is not credible to believe that Davis's agreement to the accounting reflected in the September 30, 2005 Agreement was forged but that Davis nevertheless received and deposited the checks that represented the agreed payments that were due to her.    Furthermore, Defendants' expert witness (Mr. Tytell) testified credibly that in his opinion the signature on the September 30, 2005 was Davis's signature, and that he believed this was correct to a virtual certainty.

85.    More troubling is the fact that no support has been provided for the accounting reflected in the September 30 Agreements, and some of the information in evidence suggests that the accounting may have been wrong.    The wording of the agreement itself is opaque, but it refers to a $79,841 "balance" before consideration of certain other expenses.    *See* Defendant's Exhibit

L.   Moussa referred to a handwritten document that was submitted in evidence as Defendant's

Exhibit T entitled "Altria Schedule of Expenses," and said that this document had been provided

by Davis and was the source of at least some of the figures that appear in the September 30

Agreement.   Davis denied that she had written Exhibit T; the handwriting expert was not asked to

opine on that point, and so the origins of Exhibit T are not clear.   However, Exhibit T plainly is the

source of the $79,841 figure that was incorporated in the September 30 Agreement.

86.    Exhibit T lists various payments that were made to or for the benefit of Davis

(including mortgage payments as to the Clinton Property beginning May 6, 2005), in the total

amount of $95,158.75.   It then notes that $75,000 was paid on May 6, 2005, that an additional

$75,000 was held aside with respect to the initial transfers of deeds, and that another $100,000 had

come due under the April 19 Agreement, for a total of $175,000 remaining to be paid.   Exhibit T

them shows a subtraction of the $95,158.75 of "prior payments" from the balance due of $175,000,

for a net of $79,841 (the balance reflected in the September 30 Agreement).   However, there is a

clear double-counting in this calculation, in that most of the payments that made up the $95,158.75

of prior payments were the payments by which the initial $75,000 had been paid pursuant to the

parties' May 6 Agreement.   In other words, the calculations in Exhibit T treated the initial

$75,000 as having been paid, but then deducted those same payments a second time in calculating

the balance that remained due.   The result was an understatement of $75,000 in the remaining

balance owed to Davis.

87.    The September 30 Agreement further stated that the amount owed to Davis, after

deducting unspecified expenses, was $28,015, which amounts were paid to Davis.   Davis's share

of other expenses totaling $192,000 (which included transfer taxes in connection with the August

15 transfer and Davis's share of engineering fees per the agreement dated July 12, 2005) were

scheduled to be repaid out of the future advances due to Davis under the April 20 Agreement.   *See*

Defendant's Exhibit L.   The problem with these calculations is that the Court has reviewed all of

the supporting payment information in detail (including Defendant's Exhibit S) and is unable to

find any support for the conclusion that the remaining sum due to Davis was $28,015.

88.    On the other hand, Davis and her counsel did not challenge the calculations in the

September 30 Agreement at trial and offered no contrary evidence.   Nor did they challenge the

accuracy of the September 30 Agreement in the state court Complaints, although the Complaints

do contain general allegations to the effect that Davis was not paid the full amounts due to her for

transfer of the properties.   *See* Defendant's Exhibits LL, MM and NN.   Furthermore, the parties

stipulated that in the September 30, 2005 Agreement, "Davis, M&M, Baku agreed that after all

expenses were deducted from all three projects, Davis was owed $28,015" and that "Davis

represented that she had been paid in full for all advances for the transfers of her properties, and the

only money remaining to her was her share of the proceeds from the JV."   *See* Joint Pretrial Order,

Stipulation 41.

89.    Perhaps the accounting that is reflected in the September 30 Agreement included

other sums that were not put in evidence; since Davis did not challenge the accounting, the

Defendants had no reason to provide all of the supporting details.   Though the Court believes that

the accounting was likely in error, it has no choice (based on the language of the September 30

Agreement and the parties' stipulation) but to conclude that Davis had been paid all amounts due

to her as of September 30, 2005, and that her only remaining interest was in whatever Net Proceeds

she was entitled to with respect to the development of the Clinton Property.

90.     A separate mystery arising from the September 30 Agreement is a statement that

Davis would "get 25% (1/4) instead of 50% (1/2) of the profit generated from the 8,000 square feet

of the building project in the above mentioned properties" and that the "other 25% (1/4) will be

shared 50/50" by M&M and Baku.   *Id*. ¶ 5(b) and (c).   Prior to this date the parties had agreed

that Davis's original 50% share would be split, with 75% of that share going to Davis and 25% to

Baku.   No witness testified about paragraphs 5(b) and 5(c) of the September 30 Agreement.   In

subsequent buyout agreements (described below) the parties agreed to an overall price for Davis's

and Baku's interests with respect to the Clinton Property, and agreed that Davis would be entitled

to 75% of that amount – thereby apparently agreeing that Davis's and Baku's relative shares had

not been changed since the July 12, 2005 agreements described above.   Neither party challenged

the splits set forth in the subsequent buyout agreements and the parties freely executed those

documents, so while the Court is left with a mystery the Court will nevertheless accept the parties'

unchallenged agreements as accurate, and finds that after September 30, 2005 Davis continued to

own a 75% share of one-half of the Net Proceeds from the Clinton Property.

### M.     The February 2006 Buyout Agreement

91.     Davis, Baku, M&M and Altria entered into an agreement dated February 10, 2006

(the "**February 2006 Buyout Agreement**") that "supersedes" all prior agreements.   Two

separate copies were introduced in evidence as Defendant's Exhibit N and Plaintiff's Exhibit 16;

they must reflect duplicate originals because the signatures differ and the alignment of initials

differ, but the text is the same.

92.     The February 2006 Buyout Agreement stated that M&M would buy all "shares" of

Davis and Baku with respect to Altria.   It specified a buyout price of $850,000 and set out a

schedule under which this amount would be paid.   The parties agreed that they had no other

claims against each other except to recover the buyout payments that were to be made.

93.    Davis admitted that she signed the February 2006 Buyout Agreement, but she

contended that she did so under duress.   She testified that Moussa and Morad threatened that if

she refused to sign the agreement they would refuse to make any further payments to her and that

they would embroil her in long-lasting and expensive litigation.   She also testified that Baku had

slapped her in the face (in the presence of Moussa and Morad) and that she felt physically

threatened.   However, Davis also testified that she did not sign the agreement on the first day that

the parties met to discuss it, and only did so on another day.   This portion of her testimony is

consistent with the fact that the agreement bears a date of February 9, 2006 but the signatures bear

dates of February 10, 2006.

94.    The Court did not find Davis's testimony about economic duress to be credible.

Moussa and Morad testified that they did not make the threats that Davis alleged.   They also

testified credibly that Davis and Baku had approached them to request a buyout due to other

financial problems that Davis was having.   While there was little solid evidence as to Davis's

financial condition, she admitted several times during the trial that she was having significant

financial problems, to the point where her bank accounts were closed not long after the February

2006 Buyout Agreement was signed.   In fact, one of the points of "duress" identified by Davis

was that Moussa and Morad wanted Davis to pay her share of elevator and engineering fees as

Davis had agreed to do on July 12, 2005, and that this was "unfair" because Davis did not have the

resources to do so.   Davis's financial troubles may have been a problem for her, but they are not

"duress" inflicted by Moussa and Morad.

56

95.     The Court takes very seriously Davis's contentions of physical abuse.   Davis's

accusations that from time to time she had been abused by Baku were credible.   However, the

Court did not find Davis's testimony about physical abuse in connection with the February 2006

Buyout Agreement to be credible.   Davis testified first on direct examination on May 1, 2015; she

did not testify at that time about any physical abuse in connection with the February 2006

meetings, although the Court had previously ruled that testimony about abuse committed in the

presence of the Defendants would be permitted.   After cross examination Davis was asked

additional questions on redirect examination on May 6, 2015.   During her redirect examination

the Court ruled once again that evidence of physical duress would be permitted if Davis could

show that the Defendants had knowledge of the duress and/or encouraged it.   Davis then testified

about incidents in the Dominican Republic that occurred in July 2005 and claimed that Moussa and

Morad knew of those incidents.   However, she did not testify about abuse in the February 2006

meetings.   After further cross-examination, Davis's counsel asked additional questions on May 7,

2015, and it was only then that he elicited testimony about the alleged physical abuse in February

2006.   No such accusations were made in any of Davis's pleadings and the Court finds the

circumstances under which the testimony was offered highly suspect.

96.     Furthermore, Davis did not act as though the February 2006 Buyout Agreement had

been imposed against her will or as though it were something she wished to disavow.   In fact, as

noted below she signed three subsequent amendments to the February 2006 Buyout Agreement.

Davis also accepted payments under the February 2006 Buyout Agreement, and there is no

evidence she sought to complain about it.   It was not until July 2007 (more than 18 months later)

57

that Davis first complained about any of the transactions and agreements in which she had

participated, and even then she did not complain that any of them were the product of duress.

### N.    Was Altria the "Joint Partnership" and Did Davis Own Interests In It?

97.    Altria was formed after the April 20 Agreement was executed.    The evidence at

trial made clear that Davis was never actually a member of Altria.

98.    There was considerable dispute at trial as to whether Altria itself was supposed to

be the "Joint Partnership" contemplated by the April 20 Agreement.    Davis pointed at trial to an

affirmative defense that appeared in each of the Defendants' answers in state court, which alleged

generally that Davis was barred from pursuing claims because she had entered into a joint

partnership and continued to be a partner.    *See* Defendants' Exhibits JJJ (at ¶ 39), KKK (at ¶ 37)

and LLL (at ¶ 35).    However, in those same answers Defendants denied Davis's allegations that

she was a partner with respect to the Gates Property and the Harlem Property, and denied the

specifics of her allegations regarding the contemplated partnership as to the development of the

Clinton Property.    The Court does not know what defense (or alternative defense) the Defendants

were attempting to preserve by the affirmative defenses described above, but those defenses are

not dispositive of the factual issues before the Court.

99.    Other evidence as to the parties' intentions is more troubling.    Moussa and Morad

testified that Altria was merely a "Holding Entity" (seizing upon the term used in the May 6

Indemnity), though they were inconsistent in their testimony as to just what purpose was served by

using a "Holding Entity" for the Clinton Property.    Moussa initially testified that a "Holding

Entity" was used because other problems with title had to be cleared up, but the only significant

issue affecting Clinton (the IRS judgment and lien) was addressed when the August 15 closing

occurred and the deed was executed.   At other times Moussa, and also Morad, testified that it was normal and customary for a "Holding Entity" to receive property, but if this were really the case then the April 20 Agreement would have referred to the transfer of the property to a Holding Entity.   Instead, it stated that the Clinton Property would be transferred "to" a Joint Partnership.

100.   In addition, the April 20 Agreement specified that initial payments would be due to Davis upon the transfer of the deed for the Clinton Property to the Joint Partnership.   Defendants argued that the property had only been transferred to a Holding Entity (not to a partnership).   However, the Defendants themselves treated the transfer of the Clinton Property to Altria as an event that triggered the initial payment due to Davis.   The April 20 Agreement contemplated that the Joint Partnership would have its own books and records, suggesting that the partnership was to be a separate business entity and not merely a description of the legal relationship between Davis and M&M.   However, regardless of whether Altria itself was the contemplated partnership, or whether the partnership was not a separate entity but was merely the relationship among the parties, the transfer to Altria nevertheless was consistently treated by the parties as constituting a transfer to the partnership.

101.   Davis testified that Defendants told her on numerous occasions that she was a partner in Altria, though Defendants testified that they made it clear to her at all times that she was not a partner in the company.   Defendants also prepared three separate agreements for signature by Davis that included space for her signature as a member of Altria; one was the February 2006 Buyout Agreement, and two others are described below.   The February 2006 Buyout Agreement vaguely referred to Davis's and Baku's "shares" in Altria, though as noted above there is no evidence that either Baku or Davis ever had any formal membership interest in Altria.   This

particular part of the Defendants' behavior is very troubling; it suggests that the Defendants

deliberately kept sole control of Altria for their own protection, while misleading Davis into

believing that she formally shared interests in Altria.   Defendants sought to explain all of this as

mere "sloppiness," but that testimony was not credible.   Moussa also testified that the February

2006 agreement was prepared for signature by Davis on behalf of Altria in order to cover all the

bases, but that makes no sense unless Defendants were aware that Davis was under the impression

that she was a member of Altria.

102.    Davis argued that her transfer of the Clinton Property should be negated because

the entity to which the transfer was made (Altria) was somehow different from the entity to which

she intended to make a transfer.   However, this is just another way of saying that Davis believed

she was entitled to a formal ownership interest in Altria rather than just an inchoate interest in

profits that Altria might generate.   Any deception as to whether Davis owned formal interests in

Altria made no difference once Davis agreed to sell her interests to M&M and to accept a stream of

payments in consideration thereof.   Regardless of whether Davis actually owned a "share" in Net

Proceeds rather than an ownership interest in Altria (as Defendants argued), or whether Davis

actually owned an interest in Altria itself, or whether Davis had an unfulfilled contractual right to

such an ownership share (as Davis alleged), Davis agreed in the February 2006 Buyout Agreement

to transfer her "share" in Altria (whatever it was) in exchange for a stream of payments.   That

agreement by its terms "superseded" any prior agreements or understandings and replaced any

prior agreements as to the nature of the rights that Davis would have.

### O.    Amendments and Reassurances after the February 2006 Buyout Agreement

103.    On March 6, 2006, Davis signed an agreement by which she obligated herself to vacate the Clinton Property on or before March 31, 2006.   *See* Defendants' Exhibit O, Plaintiff's Exhibit 17.   There was some minor dispute as to whether Davis did so on a timely basis but no evidence was offered as to any damages incurred as a result.

104.    On April 11, 2006, Altria executed a letter to Davis in which Altria guaranteed that it would pay off or refinance all of the mortgages on the Clinton Property that had been in Davis's name, and that Altria would do so on or before "September 30, 2005" (which in context must have meant September 30, 2006).   *See* Defendants' Exhibit Z.

105.    On April 29, 2006, Davis executed an "Addendum" to the February 2006 Buyout Agreement.   *See* Defendants' Exhibit P, Plaintiff's Exhibit 18.   It revised the payout schedule under the February 2006 Buyout Agreement and specified that payments belonging to Davis should instead be made to Davis's mother, Eutha Davis.   Davis testified that she asked for this change because Davis's only bank account had been closed.

106.    The final amendment that Davis, M&M and other parties executed was dated January 22, 2007 (the "**January 2007 Agreement**").   *See* Defendant's Exhibit Q, Plaintiff's Exhibit 19.   The written text of the January 2007 Agreement lists various prior disputes that should be treated as "part of the purchase price for Clinton," including amounts paid to Rahim with respect to the Gates Property and certain other matters.   The written text appeared to reflect an effort to "re-trade" the parties' prior agreements, notwithstanding the clear language of the February 2006 Buyout Agreement and the acknowledgments by the parties (in that agreement and in the earlier September 30 Agreement) that they had resolved their prior claims.   However, a

handwritten addition to the January 2007 Agreement states plainly that "JD is not responsible for any of the above items other than # 5," an item that referred to a minor environmental control board violation.

107.    Defendants argued at trial that the handwritten language on the January 2007 Agreement did not really negate the typed items, but their arguments in that regard were not credible.   The handwritten language was admittedly included in the agreement before it was signed and admittedly was part of the parties' agreement.   Its language is clear, and negates any contention that Davis owes any amount to Defendants with respect to the matters listed with the exception of item 5.

108.    The January 2007 Agreement also modified the payment schedule for sums that remained due under the February 2006 Buyout Agreement.   It listed a series of payments to be made through December 2007 in the amount of $80,000, and provided that the "balance" would be settled in one of three ways.   First, if M&M so chose it was entitled to make a payment of $350,000 in August 2007 (which would have the effect of negating the last $20,000 of payments due under the schedule of payments to be made in 2007).   Second, if M&M so chose it could make the scheduled 2007 payments and then pay a balance of $330,000 in December 2007. Third, if M&M could not elect either of the first two options it would owe a balance of $480,000, representing (a) an initial remaining amount due of $575,000, minus (b) the $80,000 of payments specified for 2007, minus (c) $15,000 with respect to the ECB violation identified in item 5 on the first page of the agreement.   In that event, the amount due would be for "full settlement" in 2008.

109.    The payment records submitted into evidence do not explain the calculations that are set forth in the January 2007 Agreement.   Nor is there any explanation of why the payment

amounts for full payment in 2007 (essentially a total of $410,000) are less than the payment

amounts if final payment were to be made in 2008 (a total of $560,000).   However, the amount

originally owed to Davis under the February 2006 Buyout Agreement was 75% of $850,000, or

$637,500.   The payment records in evidence (Defendants' Exhibit S) suggest that $588,500

remained owing as of January 2007, though the payment records may have omitted some other

offsets.   The parties did not offer any explanation of the calculations, but the reference in the

January 2007 Agreement to a balance of $575,000 appears in context to be a reference to the

remaining amount due under the February 2006 Buyout Agreement.   The possible payment of a

lesser amount (if payments were made during 2007 or at the very end of 2007), while not

explained, may have reflected an early payment discount.   The January 2007 Agreement specified

that the total amount to be paid to Davis, if payment was not made during or at the end of 2007,

would be $480,000.

110.    The parties have stipulated that only $45,000 was paid to Davis following the

execution of the January 2007 Agreement.   *See* Joint Pretrial Order, Stipulation 49.   The Court

finds that the balance owed to Davis was $435,000.   The January 2007 Agreement does not

specify a due date, but says that the amount would be for settlement in 2008.   A lesser amount

would have been due if payment had been made on December 31, 2007, so the parties must have

intended for there to be some meaningful difference in the payment date.   The Court finds that

$35,000 of payments were due on or after May 2007 on the schedule set forth in the January 2007

Agreement and that the remaining $400,000 came due on February 1, 2008.

111.    Defendants implied during closing arguments at trial that they interpret the January

2007 Agreement as requiring only $80,000 in total payments, and that nothing else would be due

and owing except to the extent that M&M made certain elections.   No clear explanation was offered as to what elections had to be made to trigger other payments.   In any event, the Court rejects this contention.   The January 2007 Agreement clearly contemplates a revised payment schedule during 2007 and three alternative ways of paying the remaining balance (after those payments) that is owed under the February 2006 Buyout Agreement.   There is no credible or reasonable support for Defendants' contention that Davis somehow agreed to transform a $575,000 remaining payment obligation – one incurred under a February 2006 agreement that included the parties' agreement that they owed no other obligations to each other – into a right to receive only $80,000.

**P.**     **The Alleged June 2007 Oral Agreement re Hip Pop Beverages**

112.     Defendants argued that Davis asked them, in June 2007, to exchange Davis's remaining rights to payments under the January 2007 Agreement for a 5% ownership interest in the prospective Hip Pop Beverages venture.   Moussa testified that he contemplated that a written agreement would be executed but that no written agreement ever was prepared, because Davis filed her state court lawsuits before the agreement could be drafted.

113.     It is not clear whether Defendants contend that the alleged "oral agreement" regarding Hip Pop Beverages should be enforced.   Defendants admit that a written agreement was contemplated, and for the reasons set forth below the law precludes enforcement of an oral agreement where the parties plainly contemplated that they would not be bound unless and until a written agreement was signed.   More importantly, the Court does not find the testimony about the alleged oral agreement to be credible.   The Court finds that the discussions did not occur and that the alleged oral agreement was never made.

64

**Q.    Defendants' Settlements with Baku**

114.    Baku had interests under the April 19 Agreement and under the various

amendments to the April 20 Agreement, as well as under the February 2006 Buyout Agreement

and the amendments thereto.    The parties introduced into evidence various agreements under

which the Defendants resolved their obligations with Baku and bought out his interests.    *See*

agreement dated October 19, 2005 (Defendant's Exhibit M); agreement dated November 20, 2006

(Defendant's Exhibit R).

**R.    Defendants' Damage Claims for Matters Prior to 2008**

115.    Defendants argue that the Clinton Property, the Gates Property and the Harlem

Property were only transferred to holding entities (not to partnerships) and therefore that Davis

continued to have an obligation to reimburse the Defendants for all mortgage payments that

Defendants had advanced.    However, as noted above, the Defendants themselves treated the

transfers of the deeds on May 6, 2005 and August 15, 2005 as transfers that triggered the payments

due under the April 19 Agreement and the April 20 Agreement, which payments were only due

upon transfers "to" the Joint Partnerships that were contemplated.    The Court also finds, as

explained more fully above, that Davis's obligations to make mortgage payments with respect to

the Gates Property and the Harlem Property ended on May 6, 2005, and that her obligations to

make mortgage payments with respect to the Clinton Property ended on August 15, 2005.

116.    Defendants also have argued that Davis owes damages by reason of her

misrepresentations as to the IRS lien, the Rahim Action and various violations against the

properties.    However, Defendants agreed separately with Baku that Baku (not Davis) would bear

responsibility for the $100,000 payment to Rahim, and the Defendants and Baku accordingly

agreed to reduce Baku's interest in the partnership that would develop the Gates Property and the Harlem Property. *See* Defendant's Exhibit M. Defendants have no right to a second recovery of that same amount from Davis.

117.    Furthermore, the parties' agreed accounting in the September 30 Agreement resolved any claims that Defendants' might have with respect to prior mortgage payments, the IRS lien, the Rahim Action or outstanding violations. The February 2006 Buyout Agreement (by its terms) also bars any contention that the parties owed any obligations to each other, other than those that remained as a result of the February 2006 Buyout Agreement.

### S.    Transfers of the Properties

118.    The Gates Property was transferred from MBM Development to Morad and Farzaneh on November 15, 2006 in a deed that was recorded on November 28, 2006. *See* Defendants' Exhibit VV. A satisfaction of the prior mortgage on the Gates Property (originally in the name of Davis) was filed on December 1, 2006. *See* Defendants' Exhibit XX. The Gates Property then was transferred back to MBM Development by a deed that was also dated November 15, 2006 but that was recorded on January 4, 2007. *See* Defendants' Exhibit WW.

119.    The Harlem Property was transferred from MBM Development to MBM Entertainment on May 9, 2006, through a deed that was recorded on May 22, 2006. *See* Defendants' Exhibit ZZ. MBM Entertainment executed a deed dated October 23, 2006 that gave an undivided one-third interest in the Harlem Property to Baku; that deed was recorded on November 13, 2006. *See* Defendants' Exhibit AAA. Baku transferred his one-third interest to PSY Trading, Inc. ("**PSY Trading**") by a deed that was also dated October 23, 2006 and that was also recorded on November 13, 2006. *See* Defendants' Exhibit BBB. PSY Trading was owned

66

by one or more of the Yeroushalmis.   PSY Trading and MBM Entertainment then transferred the property to Morad and Farzaneh by deed dated March 5, 2007 and recorded on March 21, 2007.   *See* Defendants' Exhibit CCC.   Morad and Farzaneh transferred the Harlem Property back to MBM Entertainment by deed dated March 26, 2014 and recorded on April 7, 2014.   *See* Defendants' Exhibit DDD.   Moussa testified that the property was transferred back to MBM Entertainment for purposes of the anticipated Chapter 11 filing, which occurred on April 8, 2014.

120.    The Clinton Property was transferred from Altria to Morad and Farzaneh by deed dated May 10, 2006 and recorded on May 23, 2006.   *See* Defendants' Exhibit RR.   Morad and Farzaneh transferred the Clinton Property back to Altria by deed dated March 26, 2014, which was recorded on April 7, 2014.   *See* Defendants' Exhibit SS.   Moussa testified that the property was transferred back to Altria for purposes of the expected Chapter 11 filing, which occurred on April 8, 2014.

121.    Moussa testified that during times when Moran and Farzaneh were the record owners of the Gates Property, the Harlem Property and the Clinton Property he nevertheless believed that the real owners were MBM Development, MBM Entertainment and Altria, respectively, and that the only reasons for the change in record ownership was to assist in mortgage refinancings and to satisfy requests made by the new mortgage lenders.

**T.    Development of the Properties**

122.    Defendants paid off all of the prior mortgages on the Gates Property, the Harlem Property and the Clinton Property, as well as taxes and carrying costs since at least February 2006. Defendants also arranged for further construction and development work on each property, and expended nearly $500,000 in the course of doing so.   *See* Defendants' Exhibit HHH.   Davis did

67

not contribute to those development efforts or to any other action (other than the passage of time)

that has contributed to increases in the value of the properties she transferred.   Davis allowed the

Defendants to make these payments, and to proceed with these development efforts, without

complaint until she elected to file her state court actions in July 2007.

### U.    Davis's Occupation of the Clinton Property

123.    The evidence at trial showed that Davis gained access to the Clinton Property in

late June or early July 2012 at a time when Davis was working as a rental agent for a real estate

brokerage firm.   The evidence was unclear as to whether Davis obtained access by using a key

that had been given to the brokerage firm (for purposes of showing an apartment for potential

rental), or whether another tenant had given Davis access.   However, it was clear that Davis took

up occupancy of a duplex apartment in the Clinton Property at this time, without the prior

agreement or approval of Altria, M&M or the Yeroushalmis.   Davis also arranged for the locks to

be changed; the Yeroushalmis were given keys only when Davis was directed by the police to

provide such keys.   Davis has occupied the apartment continually since July 2012 without paying

any rent.

124.    The evidence further showed that Davis rented one other apartment in the Clinton

Property to a tenant, signing a lease in the name of Altria and specifying that the rents would be

paid in cash.   The lease is dated June 30, 2012 and calls for payments of $1,000 per month.   *See*

Defendants' Exhibit KK.   However, the duration of that tenancy is unknown.   Davis testified that

there is a current tenant in the property, but that he helps maintain the building and does not pay

rent.   It was not clear at trial whether this tenant replaced the tenants in whose favor Davis had

executed a lease, or whether this tenant occupied a different apartment.   There was also no clear

evidence as to the rental payments that Davis received and retained.

125.     When the Yeroushalmis called the police, Davis contended that she was the true

owner of the Clinton Property and that she had a right to occupy the duplex apartment.   The police

informed the parties that they would need to work out their differences in the courts.   Farzaneh

and Morad (who at that time were the record owners of the Clinton Property) commenced an

action to have Davis removed, but Davis defended on the ground (among other things) that Altria

had no right to transfer record ownership to Farzaneh and Morad.   Ultimately there was no

resolution of these matters in the state court.   Farzaneh and Morad transferred title back to Altria

on March 26, 2014, and these Chapter 11 cases were commenced on April 8, 2014.

126.     Davis had no right under the parties' agreements to take up occupancy of the

duplex apartment in the Clinton Property, to rent any other units in that property, or to appropriate

(for herself) any rents payable with respect to units at the Clinton Property.

127.     Moussa testified that he believes the duplex apartment has a fair market rental value

of $4,500 per month and that the other rented unit (which Altria would have rented but for the

interference by Davis) has a fair market value of $2,200.   There was one reference at trial to a

potential tenant for that other unit, but no other evidence was offered to show that other tenants

were ready, willing and able to rent the unit at issue.

128.     In addition to Moussa's testimony at trial the Court also takes judicial notice of the

monthly operating reports filed by Altria during the course of its Chapter 11 case.   Those monthly

operating reports show that Davis occupies a duplex unit that is approximately twice the size

(measured in square feet) of other units.   However, another unit that is rented is listed as having a

rental price of $1,900 per month (as opposed to the $2,200 per month value to which Moussa

testified regarding a similar unit, and as opposed to the $4,500 per month value to which Moussa

testified as to Davis's unit).

129.    The Court finds that the duplex unit had a value of $3,800 per month during the

period of Davis's occupancy, and that the other unit (which Defendants could have rented but for

Davis's interference) had a value of $1,900 per month.   Since Moussa acknowledged that the

other unit was vacant when Davis moved in, the Court will not award damages for that unit for the

entire period of Davis's occupancy.   Instead, the Court finds that that Defendants reasonably

could have rented that other unit (in the absence of Davis's interference) for the period beginning

September 1, 2012 through today.

### V.    Evidence as to Alter Ego Issues

130.    Moussa and Morad fully controlled and owned (along with Farzanah, who was a

silent partner) the three Debtors and M&M at all times.   The Debtors all shared a common office

with Morad and Moussa (and all of their other business entities, including M&M) and they made

use of Moussa and Morad's only employee, Mr. Mojica.   The Debtors could not locate any

separate operating agreements for Altria, MBM Entertainment or MBM Development.   Moussa

had difficulty recalling whether he was in fact a member and/or owner of various companies at

various points in time.   The Debtors had no employees and it does not appear that they elected

officers or directors.

131.    Moussa testified that although ownership of the Harlem Property, the Gates

Property and the Clinton Property had been transferred at times to the joint ownership of Morad

and Farzaneh, the intent nevertheless was at all times that the three Debtors would remain the

beneficial owners of the properties.   That understanding was not reflected in any documents.

Instead, the identities and assets of the entities were at times matters of convenience or of the

Yeroushalmis' unexpressed intentions, rather than carefully documented matters that reflected and

respected the entities' separate existence.

132.    Furthermore, the Defendants submitted into evidence a schedule of payments made

to the mortgage companies, Davis and Baku pursuant to the parties' agreements.   *See* Defendants'

Exhibit S.   It shows that contractual payments to Davis under the contracts regarding the Clinton

Property were made at various times by M&M, MBM, and/or Altria itself.   The payment history

reflects no effort to distinguish among obligations that might be owed by one such entity as

opposed to another.

## VI.    Davis's Motion to Dismiss the Chapter 11 Cases

To dismiss a bankruptcy petition as a bad faith filing requires findings of "both objective

futility of the reorganization process and subjective bad faith in filing the petition."   *In re General*

*Growth Properties, Inc.*, 409 B.R. 43, 56 (Bankr. S.D.N.Y. 2009).   The movant has the burden of

proof that on the petition date the filing was frivolous because there was "no reasonable

probability" that the debtor would emerge from the bankruptcy proceeding and "no realistic

chance of reorganizing."   *C–TC 9th Ave. P'ship v. Norton Co. (In re C–TC 9th Ave. P'ship)*, 113

F.3d 1304, 1309-10 (2d Cir. 1997).   The Court's determination of a debtor's good faith depends

upon the totality of the circumstances, with no single factor being conclusive of the issue.   *See*

*General Growth*, 409 B.R. at 56.   The Second Circuit has set forth certain factors that could be

indicative of a bad faith filing, including:

> (1) the debtor has only one asset; (2) the debtor has few unsecured creditors
> whose claims are small in relation to those of the secured creditors; (3) the

71

debtor's one asset is the subject of a foreclosure action as a result of arrearages or default on the debt; (4) the debtor's financial condition is, in essence, a two party dispute between the debtor and secured creditors which can be resolved in the pending state foreclosure action; (5) the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights; (6) the debtor has little or no cash flow; (7) the debtor can't meet current expenses including the payment of personal property and real estate taxes; and (8) the debtor has no employees.

*C–TC 9th Ave. P'shp.*, 113 F.3d at 1311.   However, "a bankruptcy petition should be dismissed for lack of good faith only sparingly and with great caution."   *General Growth*, 409 B.R. at 56. Therefore, a determination of any, or several, of these factors may not serve to establish bad faith; for example, a finding that a bankruptcy petition was filed with the intent to frustrate creditors may not be adequate to evidence the "absence of intent to seek rehabilitation" because affording a debtor "breathing room" from creditors is a major goal of the bankruptcy laws, and it is expected that creditors will be delayed and "frustrated" when the debtor files a petition.   *In re Cohoes Industrial Terminal, Inc.*, 931 F.2d 222, 228 (2d Cir. 1991).

In these cases, the evidence shows that incomes from the Gates Property and the Clinton Property were not sufficient to pay ongoing expenses, and that all three properties faced mortgage foreclosures.   Davis therefore was not the only creditor asserting claims with respect to the Debtors.   The Chapter 11 filings serve the legitimate purpose of holding foreclosure suits at bay until Davis's claims could be resolved and sales of the properties could be arranged.   Notably, Davis herself did not challenge the Chapter 11 filings when they were initially made – to the contrary, she removed her lawsuits to this Court for resolution – and she only made her "bad faith" contentions shortly before trial, in circumstances that suggest the motion primarily served tactical goals.   In any event, the Court finds no grounds to dismiss the Chapter 11 cases.

## VII.    Conclusions of Law as to the Parties' Claims and Counterclaims

The primary relief that Davis seeks is the imposition of a constructive trust or other

equitable lien on the Gates Property, the Harlem Property and the Clinton Property, or a rescission

of the transfers of those properties.    In the alternative she seeks damages for fraud, conversion,

breach of contract or unjust enrichment.    Since the underlying claims of fraud, conversion, duress

or other wrongdoing are the underpinnings of all the relief that Davis seeks (except relief for

breach of contract), it is useful to discuss those claims first.    The Court will then address Davis's

equitable claims and the Defendants' counterclaims.

### A.    Davis's Fraud Claims

To prevail on a claim for fraud in New York, the plaintiff must establish, by clear and

convincing evidence, the following elements: (1) a material misrepresentation of fact; (2)

knowledge of its falsity; (3) an intent to induce reliance; (4) justifiable reliance by the plaintiff; and

(5) damages.    *See Eurycleia Partners, LP v. Seward & Kissel, LLP,* 12 N.Y. 3d 553, 556 (N.Y.

2009); *In re Testa*, 988 N.Y.S.2d 526 (N.Y. Sur. 2014).

Davis alleged in her Complaints that the Yeroushalmis were "con men" and that she was

not aware of that fact when she signed the April 19 Agreement and the April 20 Agreement.    *See*

Defendants' Exhibit LL, ¶ 11; Defendants' Exhibit MM, ¶ 13; Defendants' Exhibit NN, ¶ 11.

There was some reference to this issue in opening statements, but no evidence was offered on this

point.    This particular claim of fraud therefore must be rejected.

Davis also alleged in her Complaints that the Yeroushalmis had no actual development

expertise; that they never actually intended to develop the Gates Property, the Harlem Property and

the Clinton Property; that development efforts on the Gates Property and the Harlem Property had

been "abandoned" by October 5, 2005; and that development efforts on the Clinton Property had

been abandoned as of September 1, 2005.   *See* Defendants' Exhibit LL ¶ 9; Defendants' Exhibit

MM ¶ 11; Defendants' Exhibit NN ¶ 9.   There was no evidence at trial to support any of these

contentions.   To the contrary: Moussa testified credibly about the Yeroushalmis' extensive

development expertise.   The evidence also showed plainly that the Defendants took numerous

steps towards the development of the properties and ultimately did renovate those properties.

Accordingly, this claim of fraud must be rejected.

Davis also alleged that Moussa and Morad lied to her about the terms of the April 19

Agreement and allegedly assured her that Davis (not Baku) would be the 50% owner of the Joint

Partnership that would develop the Gates Property and the Harlem Property.   A court may

consider a claim of fraud when false statements (extraneous to a contract) are made for the purpose

of inducing a party to enter into a contract.   *See Weisblum v. Prophase Labs, Inc.,* -- F. Supp. 3d

--, 2015 WL 738112, *12 (S.D.N.Y. Feb. 20, 2015).   However, in this case there is nothing

"extraneous" about the alleged false statements.   Davis acknowledged that she read the April 19

Agreement and understood that by its terms it made Baku a partner, not Davis.   Her testimony

about alleged misrepresentations by Moussa on these same points go to the core of what the

contract says and are barred by the parol evidence rule, and Davis cannot evade the parol evidence

rule by relabeling the same alleged statements as "fraud."   *See Clark Const. Corp. v. BLF Realty*

*Holding Co.,* 28 A.D.3d 367 (App. Div 1ˢᵗ Dept. 2006) (dismissing plaintiff's claim for fraud as

duplicative of its breach of contract claim and applying the parol evidence rule); *Eastern Sav.*

*Bank, FSB v. Sassouni,* 68 A.D.3d 917 (App. Div. 2d Dept. 2009).

More importantly, the Court has found that the alleged misstatements about the meaning of the April 19 Agreement did not occur.    *See* Part V(B), above.    Accordingly, this particular claim of fraud fails on both factual and legal grounds.

### B.    Davis's Conversion Claims

Conversion is the unauthorized "exercise of dominion over or interference with" property in defiance of the owner's rights.    *See Petty v. Barnes,* 70 A.D.3d 661, 662 (App. Div. 2d Dept. 2010).    "A wrongful 'intention' to possess the property of another is not an essential element of a conversion.    It is sufficient if the owner has been deprived of the property by the defendant's unauthorized act in assuming dominion and control."    23 N.Y. Jur. 2d Conversion, Etc. § 1.

Davis contends that she never executed the deeds to the Harlem Property or the Gates Property, but the Court has rejected those contentions as a factual matter for the reasons stated in Part V(F), above.    Defendants exercised dominion and control over the properties by reason of contracts and instruments that Davis executed, and no conversion occurred.

### C.    Davis's Allegations of Duress

Duress exists where (1) one party made threats of an unlawful act which (2) compelled another party to take an action which it had a legal right to abstain from performing.    *See Makinen v. City of New York,* 53 F. Supp. 3d 676 (S.D.N.Y. 2014) ("Under New York law, duress exists where a person, by the unlawful act of another, is induced to take an action which he had a legal right to abstain from performing."); 22 N.Y. Jur. 2d Contracts § 128 ("To support a claim of duress, the actions of defendant must be found to have either deprived the plaintiff of the ability to act in furtherance of his or her own interests or the ability to exercise free will.    Doing what one has a legal right to do, or refusing to refrain from doing what one has a legal right to do, does not

75

constitute duress."). To establish duress, it is not sufficient to merely show that threats were made; the plaintiff must also show that those threats constrained the will of the plaintiff and induced the plaintiff to act. *See* 22 N.Y. Jur. 2d Contracts § 129. For example, a threat to resort to civil litigation or legal remedies does not constitute duress, since "[i]t is never duress to threaten to do what one has a legal right to do." *Citibank, Nat. Ass'n v. London,* 526 F. Supp. 793, 803 (S.D. Tex. 1981) (applying New York law). On the other hand, a threat to give false testimony or to allege an unfounded claim may constitute duress. *See Application of Gruen,* 173 Misc. 765, 767 (N.Y. Sup. 1940) ("Although threats to institute legal proceedings or take other action which the law permits are insufficient in themselves to constitute duress, the rule is different where threats are made to give false testimony or to assert a wholly unfounded claim.").

There is no general rule or legal standard as to the sufficiency of facts to produce duress. The question in each case is whether the person "was so acted upon by threats for the purpose of obtaining the contract as to be bereft of the quality of mind essential to the making of a contract, and whether the contract was obtained thereby." 22 N.Y. Jur. 2d Contracts § 130.

However, as a matter of New York contract law a party who claims "duress" must do so promptly. Delay precludes a contention that the contract was invalid on grounds of duress. *See DiRose v. PK Management Corp.,* 691 F.2d 628, 633-34 (2d Cir. 1982) ("[T]he person claiming duress must act promptly to repudiate the contract or release or he will be deemed to have waived his right to do so."); *In re Marketxt Holdings Corp.,* 361 B.R. 369, 402 (Bankr. S.D.N.Y. 2007) ("A failure to promptly repudiate a contract entered into under duress will be deemed a ratification of that contract."); *Bank Leumi Trust Co. of New York v. D'Evori Int'l, Inc.,* 558 N.Y.S. 2d 909, 914 (1990). In addition, a party who accepts benefits under a contract, without challenging the

76

legitimacy of the contract, has ratified the contract and is precluded from later seeking to undo it on grounds of duress.   *See Marketxt Holdings*, *supra* ("Ratification can also occur through 'intentionally accepting benefits under the contract,' by 'remaining silent or acquiescing in the contract for a period of time after he has the opportunity to avoid it,' or by 'acting upon it, performing under it, or affirmatively acknowledging it.'") (citations omitted).

Davis implied that she intended to challenge the April 19 Agreement on grounds of duress. *See* Defendants' Exhibit OO ¶ 16.   However, during closing arguments Davis's counsel conceded that Davis had willingly executed both the April 19 Agreement and the April 20 Agreement. Duress was alleged only in connection with modifications to the parties' contracts that occurred in July 2005 and February 2006.   The Court has rejected Davis's claims of duress on factual grounds for the reasons stated above, but Davis's claims of duress are legally deficient as well.

As to the July 2005 agreements: Davis contended that Baku had struck her some time prior to those agreements, while she and Baku were in the Dominican Republic.   She also testified that she did not wish to grant Baku any part of the 50% interest in Net Proceeds to which she was entitled for the Clinton Property.   However, while she was unhappy with the agreement, she never testified that she was threatened to the point where she felt compelled to execute it against her will. Furthermore, a party who claims that she executed a contract under duress must promptly take action to repudiate the agreement.   Here, Davis made no claim of "duress" at or near the time that the July 2005 agreements were executed, or even in the pleadings she filed in the state court in July 2007.   She reaffirmed the July 2005 agreements in later contracts (including the February 2006 Buyout Agreement and the January 2007 Agreement) and accepted benefits under those agreements, including tens of thousands of dollars in payments.

Davis testified that at the time of the February 2006 Buyout Agreement the Defendants allegedly threatened that they would refuse to make payments to her, and would engage her in endless litigation, if she refused to sign.    The Court finds as a factual matter that no such threats were made.    Furthermore, threats of this kind are not sufficient as a matter of law to constitute duress, even if they had occurred.    A contract may be voided on the basis of economic duress where one party unjustly took advantage of the economic necessities of another party, but only where that party also threatened to do an unlawful injury.    *See Sosnoff v. Carter,* 165 A.D.2d 486, 490 (App. Div. 1st Dept. 1991).    However, duress does not exist based only on the existence of financial pressure and unequal bargaining position or on a lack of good faith in performing a contract.    *See Gubitz v. Security Mut. Life Ins. Co. of New York,* 262 A.D.2d 451, 452 (App. Div. 2d Dept. 1999) ("[F]inancial pressures, even when coupled with inequality in bargaining position, do not, without more, constitute duress."); *Corvino v. CBS Inc.,* 92 A.D.2d 536, 537 (App. Div. 2d Dept. 1983) ("Such alleged lack of good faith upon the part of defendant in performing the original contract, although perhaps constituting a breach of that contract, is insufficient to establish that plaintiff was coerced into executing the release.").    In addition, even if a party threatens to breach a contract by withholding performance, duress only exists when the facts show that such breach will result in irreparable harm that adequate damages at law could not remedy.    *See Sosnoff,* 165 A.D.2d at 491 ("A demonstration of economic duress can be made by proof that one party to a contract has threatened to breach the agreement by withholding performance unless the other party agrees to some further demand.    This showing of a threatened violation of the contractual obligations by itself ordinarily will not suffice.    However, economic duress is established when the facts show that such breach will result in an irreparable injury or harm.").    Davis did not allege

78

or prove conduct sufficient to satisfy duress under this standard.   As discussed below, while the

Court finds that the Yeroushalmis did fail to full perform all of their contractual obligations owed

to Davis, Davis will be adequately compensated for her loss.

Finally, Davis testified that Baku struck her in the presence of Moussa and Morad when the

February 2006 Buyout Agreement was being discussed.   The Court has rejected this contention as

a factual matter, as noted above.   However, Davis also testified that after this alleged incident she

left the Yeroushalmis' offices and did not return until the next day, at which time she executed the

February 2006 Buyout Agreement.   She did not testify that she had been forced to return or that

her free will was compromised when she did so.   Furthermore, she accepted payments under that

agreement for many months; agreed to modify it on several occasions, including by agreeing to a

modified payment schedule in January 2007; and then accepted payments for a number of

additional months.   Even when she filed suit in July 2007 Davis did not contend that the February

2006 Buyout Agreement had been the product of duress.

As an additional note, if a party to a contract is unaware of the fact that the other party was

induced to enter the contract by duress by a third party, that contract is not invalidated.   "[D]uress

exercised by a third person does not affect the rights of an obligee who does not participate

therein."   22 N.Y. Jur. 2d Contracts § 131; *see also Citibank*, 526 F. Supp. at 804 ("[T]he alleged

threats of a stranger to a contract, have been held to be insufficient to support a claim of duress

between contracting parties.").   The evidence is not sufficient to show that the Yeroushalmis

participated in or were aware of Baku forcing Davis to enter any contracts against her will.

For each of these reasons, Davis's claims of duress must be rejected.

### D.    Transfers to LLCs that Allegedly Were Not Qualified to Do Business in NY

Davis alleged in her Complaints that MBM Development, MBM Entertainment and Altria were not qualified to do business in New York State and that the transfers of property to and by those entities should be disregarded.   Defendants denied the allegations that Davis made.  However, no party offered any evidence as to whether these entities were or were not qualified to do business in New York.   Davis bore the burden of proof on this issue and so her claim fails as a factual matter.

In any event, Davis's claim also is legally deficient.   A limited liability company that is not qualified to do business in New York is subject to certain limitations, such as restrictions on its ability to initiate a lawsuit.   *See N.Y. McKinney's Limited Liability Company Law* § 808(a).  However, such an entity is entitled to hold real property and to enter into contracts.   *RMS Residential Properties, LLC v. Naaze*, 903 N.Y.S.2d 729 (Dist. Ct., Nassau County, 2010).  Moreover, although not entitled to initiate an action in the state courts, it may defend itself against any action or proceeding brought against it in the state.   *N.Y. McKinney's Limited Liability Company Law* § 808(b).

### E.    Davis's Request for Imposition of a Constructive Trust

Davis is not entitled to the imposition of a constructive trust for a variety of legal and factual reasons.

First, under New York law a constructive trust is not an appropriate remedy where the rights of the parties are governed by a written agreement.   This principle stems from a series of cases that held that claims for unjust enrichment cannot exist in the face of a valid and enforceable written agreement.   *See Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 388

80

(1987) ("The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter.").   In *Superintendent of Ins. v. Ochs (In re First Central Financial Corp.)*, 377 F.3d 209 (2d Cir. 2004), the Second Circuit extended this principle to constructive trust claims.   *See also Abraham v. American Home Mortg. Servicing, Inc.*, 947 F. Supp. 2d 222 (E.D.N.Y. 2013) ("It is well established that the existence of a contract precludes a claim for a constructive trust."); *Soroof Trading Dev. Co., Ltd. v. GE Fuel Cell Sys., LLC,* 842 F. Supp. 2d 502, 514 (S.D.N.Y. 2012).

Here, the parties' relationship is governed by the April 19 Agreement and the April 20 Agreement and the many amendments thereto.   Davis challenged the validity and enforceability of those agreements on grounds of fraud, conversion and duress, but those claims are legally and factually deficient in the ways set forth above.   Accordingly, Davis's claims for a constructive trust and unjust enrichment must fail.

Second, even if the Court were to look beyond the contracts or to treat them as invalid, Davis still has failed to meet her burden of proving that she is entitled to a constructive trust or that the Defendants were unjustly enriched.

New York courts have set forth four elements that generally must exist in order to impose a constructive trust: (1) a confidential or fiduciary relationship; (2) a promise; (3) a transfer in reliance on the promise; and (4) unjust enrichment.   *See Marini v. Lombardo*, 79 A.D.3d 932, 934 (App. Div. 2d Dept. 2010).   The standard of proof for establishing a constructive trust is clear and convincing evidence.   *See Bower v. Bower*, 988 N.Y.S.2d 521 (N.Y. Sup. 2014).   Here, there was no confidential or fiduciary relationship when the April 19 Agreement and the April 20 Agreement were signed; the parties negotiated at arm's length in making those contracts.   Nor was there any

81

"promise" or misrepresentation that induced Davis to part with her property.   Davis testified that

Moussa and Morad promised her that she would become a 50% partner in a joint partnership for

the Harlem Property and the Gates Property and that she transferred those properties in reliance on

that promise, but the Court has found that no such representations were made.   The April 19

Agreement (which Davis admittedly read) plainly states that Baku, not Davis, would be the partner

in the partnership that would develop the Gates Property and the Harlem Property.   The only

"promises" made were those set forth in the parties' contracts.

New York courts have also held that a confidential or fiduciary relationship, and other

usual elements of a constructive trust, are not always required, and that a constructive trust may be

imposed so long as "continued holding of the property in question by the defendant be deemed

unconscionable and inequitable, and the return of the property be necessary to prevent unjust

enrichment."   *Ackerman v. Ventimiglia (In re Ventimiglia),* 362 B.R. 71, 86 (Bankr. E.D.N.Y.

2007); *see also Marini,* 79 A.D.3d at 933 ("[T]hese elements serve only as a guideline, [and] a

constructive trust may still be imposed even if all the elements are not established."); 106 N.Y. Jur.

2d Trusts § 166 (2d Ed. 2015) (noting that "the constructive trust doctrine is not rigidly limited by

the four commonly stated elements").   Constructive trust remedies therefore may be invoked in

appropriate cases involving fraud, conversion, or duress.   *See, e.g., Robinson v. Day,* 103 A.D.3d

584 (App. Div. 1st Dept. 2013); *Duran v. Bautista,* 47 Misc. 3d 1207(A) (N.Y. Sup. 2015); 106

N.Y. Jur. 2d Trusts § 233.   However, Davis failed to establish fraud, conversion or duress.

Furthermore, the terms upon which Davis transferred the Harlem Property, the Gates Property and

the Clinton Property were not unfair or unconscionable.

Davis acquired the Gates Property and the Harlem Property primarily at the instigation and for the benefit of Baku.   She invested only a relatively small amount in acquiring the properties, was having difficulty making mortgage payments, and received a promise of $150,000 (and relief from the mortgage obligations) upon a transfer of the properties pursuant to the April 19 Agreement.   Davis complained that the April 19 Agreement would have been unfair and unconscionable if it had been interpreted as requiring her to pay the entirety of the mortgages and other carrying costs for the Harlem Property and the Gates Property even after she had transferred those properties to MBM Development, but the Court has rejected the idea that the April 19 Agreement imposed such an obligation.   There is nothing about the April 19 Agreement, as construed by the Court, that is unconscionable or that supports a claim of unjust enrichment.

Similarly, there was nothing unconscionable or unfair about the terms of the April 20 Agreement with respect to the Clinton Property.   Davis testified that she entered into the April 20 Agreement of her own free will and that she desired to participate in a development partnership on the terms set forth in that agreement.   The parties agreed as to how they would share the advance of expenses, M&M was to lend its expertise to the development of the property (something Davis was not equipped to do ), and the parties would split the Net Proceeds.

In September 2005, the parties agreed to an accounting of the amounts previously paid and the amounts that still were owed to Davis.   The Court has noted above that it has concerns as to whether this accounting was complete and accurate.   However, Davis did not challenge it during the trial, and she stipulated that she had agreed that the accounting represented a full payment of the sums due to her.   There was no evidence upon which the Court could find that the accounting was fraudulent, unconscionable or wrongful in any way.

83

In February 2006, Davis agreed to sell her interests.    She testified that as of February 2006 the value of the Clinton Property was approximately $2.2 million and that the outstanding mortgage was approximately $1 million; given those figures, a sale would have generated a profit of $1.2 million, of which Davis would have had a share of $600,000.    Under those circumstances, the Defendants' agreement to pay $850,000 for the 50% "share" of net profits jointly owned by Davis and by Baku was fair and reasonable.    In any event, for the many reasons stated above, Davis agreed to that price and accepted numerous payments pursuant to her agreement, and has no right to undo the agreement simply because it now appears – almost ten years later – that the property is worth more than it was worth at the time.

Third, imposing a constructive trust would be an inappropriate remedy under the circumstances of this case.    The imposition of a constructive trust is an equitable remedy and can only be done when the result is to put the parties in the position that equity requires.    That is not possible here.    The April 19 Agreement contemplated that Davis would receive flat payments to relinquish her interests in the properties, and Davis acknowledged in September 2005 that she had been paid in full under that agreement.    The April 20 Agreement contemplated that Davis would share certain capital risks (principally through the ongoing advances of mortgage payments and other carrying costs) as her part of a joint partnership, but the evidence showed that Davis rarely (if ever) made any of the advances that the agreement contemplated.    Instead, all of the risks and burdens of the redevelopment were borne by the Defendants.    Defendants have paid the mortgages, paid carrying costs since at least February 2006, paid for all construction and renovation costs, made all of the construction and renovation decisions, incurred all of the risks

84

and expenses of doing so, and are responsible for all of the circumstances (other than the passage of time) that could account for an increase in the value of the properties.

Davis has no equitable right to share in the increased property values that came about through the Defendants' efforts.   *See Counihan,* 194 F.3d at 631.   A constructive trust is supposed to be a remedy for unjust enrichment; under the circumstances of this case the relief that Davis seeks (a return of the properties to her sole ownership, subject only to the current mortgages), or giving her any share in the increased values brought about by the Defendants' investments and efforts, would create an unjust enrichment rather than remedying one.

In *Fizzinoglia v. Capozzoli*, 946 N.Y.S.2d 66 (N.Y. City Ct. 2012), the court declined to impose a constructive trust even in the presence of a confidential relationship between the parties, because the element of unjust enrichment was lacking.   The plaintiff transferred property to the defendant, who paid approximately $45,000 in consideration, and the defendant satisfied the plaintiff's mortgage on the property in full.   The court held that, as a result of these payments, the defendant's retention of the property was not unjust.   Here, similarly, the Defendants made payments to Davis; paid off the mortgages in full on those Properties (two of which were in default); paid carrying costs; and invested substantial sums in the renovation of the properties. Davis's remedies, if any, are her common law claims for damages for breach of contract or fraud.

### F.    Davis's Request for an Equitable Lien

Davis has also asked in her Complaints for imposition of an equitable lien or an equitable mortgage.   Under New York law, an equitable lien is imposed on property when a party, who has a confidential relationship with the owner, expends money to improve that property based on the owner's promise to convey, reimburse or grant an interest in the property to the party.   *See Farr v.*

*Covert*, 34 A.D.3d 1204, 1205, (App. Div. 4th Dept. 2006); *Reisner v. Stoller*, 51 F.Supp. 2d 430,

453 (S.D.N.Y.1999) ("[w]ith respect to real property, an equitable lien is created by implication

when a party standing in a confidential relationship with the legal owner of the property makes

payments from his or her own funds toward the purchase price, reduction of the mortgage or

improvements to the real property under circumstances which would entitle that party to

restitution").    An equitable lien may also be imposed if there is "proof of an intention that the

premises would be held as security for the obligation."    *Billson Housing Corp. v. Harrison*, 205

N.Y.S.2d 387, 389 (Supreme Court, Suffolk County, 1960).    However, the intention that there is

to be a lien must be clear.    *Conkling v. First Nat'l Bank of Olean, N.Y.*, 286 A.D. 537, 541 (App.

Div. 4th Dept. 1955).

    An express or implied agreement to convey an interest in the property itself is an essential

element of a claim to an equitable lien or equitable mortgage.    *See Petrukevich v. Maksimovich*, 1

A.D.2d 786 (App. Div. 2d Dept. 1956).    There must be an express or implied agreement that there

shall be a lien on specific, clearly identified property and the intent to establish the lien must be

clear.    *See James v. Alderton Dock Yards, Ltd.*, 256 N.Y. 298 (1931).    The "subjective

expectation of plaintiff that an interest in the property would be conveyed to him, however sincere,

is insufficient to establish an equitable lien."    *Farr v. Covert*, 34 A.D.3d at 1205; *see also Lester v.

Zimmer*, 602 N.Y.S.2d 711, 712 (1993).    An equitable mortgage is "a transaction which has the

intent but not the form of a mortgage, and which a court will enforce in equity to the same extent as

a mortgage."    *Mailloux v. Spuck*, 87 A.D.2d 736, 737 (App. Div. 3d Dept. 1982).

    Here, Davis offered no evidence that she made any payments that ought to entitle her to an

equitable lien of any kind.    She testified that she made some mortgage payments, but there is no

86

evidence that she made any payments other than those that were contemplated by the April 19

Agreement and the April 20 Agreement.   In fact, Defendants offered convincing evidence that

Davis had failed to make the advances that the April 20 Agreement contemplated.

Furthermore, the actual agreements of the parties were plainly set forth in their writings.

While Davis expected to have a 50% interest in the "Net Proceeds" from a "Joint Partnership" for

the Clinton Property, there is nothing in the parties' contracts that suggests that Davis was to have

a continuing ownership interest in the Clinton Property itself.

Davis's claim for an "equitable lien" really relates to her contentions that she should have a

greater share in the profits to be derived from the appreciated value of the renovated properties as a

result of other parties' efforts, rather than a claim that she is entitled to recover a specific

expenditure that she made in the past.   Her claims for an "equitable lien" or an "equitable

mortgage" have no merit.

### G.    Rescission

Davis has asked generally that her transfers of the three properties be undone and that

ownership of all three properties be restored to her.   This apparently is a claim for rescission (or

perhaps it is merely duplicative of the constructive trust claim).   In any event, rescission is not an

appropriate remedy for many reasons.

First, Baku was a party to the April 19 Agreement, and in effect he became a party to the

April 20 Agreement in July 2005, when Davis agreed that Baku would be entitled to a portion of

Davis's share of Net Proceeds under the April 20 Agreement.   Baku received substantial

payments under the two agreements, totaling $404,201.   However, Baku is not a party to the

proceedings before this Court.   The Court has no power to order a rescission of contracts that

87

affect Baku when Baku has not even been present to state his view of those contracts or to defend

his interests.    *See Frymer v. Bell,* 99 A.D.2d 91, 95 (App. Div. 1st Dept. 1984) ("In an action for

rescission, all parties to the agreement must be brought before the court."); 12A C.J.S.

Cancellation of Inst. § 114 ("All persons whose rights, interests, or relations would be affected by

the cancellation or rescission of an instrument or contract are proper and necessary parties.").

Similarly, the Court has no power to compel Baku to return any of the consideration that was paid

to him under the contracts.    *See Pettersen v. Town of Ft. Ann,* 87 N.Y.S.2d 319, 322 (N.Y. Sup.

2008) ("The general rule is that a judgment does not bind persons who are not parties to the

action.") (*quoting Samoorian v. Hertz Corp.,* 15 A.D.2d 750, 751 (App. Div. 1st Dept. 1962); *see

also* CPLR § 1001(a) ("Persons who ought to be parties if complete relief is to be accorded

between the persons who are parties to the action or who might be inequitably affected by a

judgment in the action shall be made plaintiffs or defendants.").

Second, the evidence at trial did not support a claim that any wrongdoing occurred that

would justify the remedy of rescission.    *See New Paradigm Software Corp. v. New Era of

Networks, Inc.,* 107 F. Supp. 2d 325, 326 (S.D.N.Y. 2000) ("[T]o justify the remedy of rescission,

a party must allege fraud in the inducement of the contract; failure of consideration; an inability to

perform the contract after it is made; or a breach in the contract which substantially defeats the

purpose thereof.") (citations and quotations omitted).    Davis did not prove fraud, as explained

above.    Davis has alleged generally that there was a failure of consideration under the parties'

contracts, but such a contention requires proof that no consideration was provided at all and could

not have been provided in light of circumstances that the parties did not anticipate.    *See

Independent Energy Corp. v. Trigen Energy Corp.*, 944 F.Supp. 1184, 1195, 1199 (S.D.N.Y.

88

1996) (noting that although failure of consideration gives a party a right to rescind the contract where little or nothing of value was received, "a partial failure of consideration may not be sufficient to justify rescission").   Here, payments were made to Davis, and Davis ultimately agreed that her contractual rights would be limited to a stream of buyout payments – some of which were paid and accepted.   Davis disagrees with the Defendants as to what the contracts required, and she contends that the Defendants breached their contracts, but that does not mean there was a "failure of consideration" that would warrant rescission.

Third, Davis received and accepted payments under the February 2006 Buyout Agreement, as amended by the January 2007 Agreement.   By accepting those benefits, Davis implicitly ratified the transactions and is foreclosed from seeking rescission of them.   *See In re Marketxt Holdings Corp.,* 361 B.R. 369, 402 (Bankr. S.D.N.Y. 2007) ("Ratification can also occur through 'intentionally accepting benefits under the contract,' by 'remaining silent or acquiescing in the contract for a period of time after he has the opportunity to avoid it,' or by 'acting upon it, performing under it, or affirmatively acknowledging it.'") (citations omitted).

Fourth, "it is well-settled that rescission is an equitable remedy which will not be granted unless Plaintiffs lack an adequate remedy at law."   *New Paradigm Software,* 107 F. Supp. at 326; *see also* 2 N.Y. Prac., *Com. Litig. in New York State Courts* § 9:21 (3d ed.) ("A party seeking rescission must also show that damages are not an adequate remedy.").   The end result of the parties' many agreements and amendments is that Davis is entitled to a stream of payments, and nothing more.   This is a prototypical situation in which there is an adequate remedy at law and in which equitable relief is not warranted.

### H.    Davis's Contentions that the April 19 Agreement Was Unconscionable

The Court denied Davis's request to amend her pleadings to introduce a new contention

that the parties' contracts were unconscionable.    However, the issue arose many times during the

trial in the context of Davis's claims of fraud and also in the context of Davis's claims for

imposition of a constructive trust.    Those points are addressed above.    It should be noted for the

sake of completeness that the evidence at trial plainly did not support a claim that the contracts

were unconscionable.

The Second Circuit has described the circumstances under which a contract is considered

unconscionable under New York law as follows:

> [A] contract is unconscionable when it is "so grossly unreasonable or
> unconscionable in the light of the mores and business practices of the time and
> place as to be unenforceable [sic] according to its literal terms."    Generally,
> there must be a showing that such a contract is both procedurally and
> substantially unconscionable.    "The procedural element of unconscionability
> concerns the contract formation process and the alleged lack of meaningful
> choice; the substantive element looks to the content of the contract[, per se]."

*Ragone v. Atlantic Video at the Manhattan Center*, 595 F.3d 115, 122 (2d Cir. 2010) (citations

omitted).    Although a showing that the contract is both procedurally and substantively

unconscionable ordinarily must be made, there are rare cases where "a provision of the contract is

so outrageous as to warrant holding it unenforceable on the ground of substantive

unconscionability alone."    *See Gillman v. Chase Manhattan Bank*, 537 N.Y.S.2d 787, 791-92

(1988).    Although the traditional remedy for an unconscionable contract is to deny its

enforcement, courts have "substantial flexibility" in determining the remedy for an

unconscionable contract.    *See Oneida Indian Nation of New York v. Cnty. of Oneida*, 617 F.3d

114, 138 (2d Cir. 2010) (*citing* Restatement (Second) of Contracts § 208 (1981) ("If a contract or

term thereof is unconscionable at the time the contract is made a court may refuse to enforce the

contract, or may enforce the remainder of the contract without the unconscionable term, or may so limit the application of any unconscionable term as to avoid any unconscionable result.")).

In this case, the evidence was clear that Davis did not find herself in a situation in which she had no control over the contracts she signed.   To the contrary: the evidence is that she was capable of raising objections, and that on several occasions her objections resulted in significant handwritten modifications to the proposed contracts that materially altered those contracts in Davis's favor, including (a) the handwritten addition to the April 19 Agreement of an obligation to pay $150,000 to Davis in lieu of paying nothing, (b) the handwritten addition to the April 19 Agreement of an obligation by Baku and M&M to pay the mortgages following a transfer of the property (in clarification of an otherwise ambiguous provision as to the extent of Davis's obligation to pay the mortgages), and (c) a handwritten addition to the January 2007 Agreement that negated the written "obligations" that Defendants sought to assign to Davis with the limited exception of an agreement to bear the expense of a minor violation as to the Clinton Property.

As to the substance of the agreements: the Court has already reviewed the terms of the agreements in connection with Davis's claims for a constructive trust and has concluded they were fair and reasonable and not unconscionable.

## I.    Davis's Breach of Contract Claims

Under New York law, the elements required to establish a breach of contract are (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages.   *See Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996).   If the contract is clear and unambiguous, it is given effect as written.   However, if the contract is capable of "alternative, reasonable constructions" it is ambiguous, and the issue is for

91

the trier of fact to decide. *See K. Bell & Assocs., Inc. v. Lloyd's Underwriters*, 97 F.3d 632, 637

(2d Cir. 1996); *Readco,* 81 F.3d at 299.    The initial interpretation of "whether a contract is

ambiguous is a matter of law for the court to decide, and parol evidence is not admissible to create

an ambiguity."  *Readco, Inc. v. Marine Midland Bank*, 81 F.3d 295, 299 (2d Cir. 1996).

In addition, in order to plead a breach of contract claim, "a plaintiff must identify what

provisions of the contract were breached as a result of the acts at issue."  *Wolff v. Rare Medium,*

*Inc.*, 171 F. Supp. 2d 354, 358 (S.D.N.Y. 2001) (dismissing breach of contract claim because

plaintiffs failed to identify the contractual provisions that defendant allegedly breached).

Moreover, "[s]tating in a conclusory manner that an agreement was breached does not sustain a

claim of breach of contract."  *Berman v. Sugo L.L.C.*, 580 F. Supp. 2d 191, 202 (S.D.N.Y. 2008).

In determining a party's obligations under a contract, "the initial interpretation of a contract is a

matter of law for the court to decide."  *K. Bell & Assocs.,* 97 F.3d at 637.

Some of the parties' agreements were clear and unambiguous, but in many respects the

agreements were unclear and required further evidence and interpretation.    The Court has

described its findings as to the parties' agreements in detail in Part V, above.    For the most part,

Davis's claims of "breach of contract" are based on her allegations about alleged oral agreements

that did not exist (or that are barred by the parol evidence rule) or based on interpretations of the

parties' contracts that the Court has rejected.    Based on the findings of fact set forth above, the

only remaining contractual obligation owed to Davis after February 2006 was the obligation to

make payments pursuant to the terms of the February 2006 Buyout Agreement, as modified by

later agreements.    The Court holds based on the evidence that the remaining amount of $435,000

was owed to Davis as of July 1, 2007 pursuant to the January 2007 Agreement, but that Davis has

92

no other claims for breach of contract.   For purposes of calculating interest, the payments that were originally scheduled to be due during 2007 (but that were not made) should accrue interest from and after the dates when they were due.   The remaining $400,000 should carry interest from and after February 1, 2008.

### J.       Davis's Alter-Ego and Piercing the Corporate Veil Claims

Under New York law, "[a]llegations of lack of corporate formalities, comingling of funds, and self-dealing are sufficient to support a claim seeking to pierce the corporate veil.   Also, the corporate veil can be pierced where there has been, inter alia, a failure to adhere to corporate formalities, inadequate capitalization, use of corporate funds for a personal purpose, overlap in ownership and directorship, or common use of office space and equipment."   14 N.Y. Jur. 2d Business Relationships § 34; *see also Int'l Credit Brokerage Co., Inc. v. Agapov*, 249 A.D.2d 77, 78 (App. Div. 1st Dept. 1998) (denying a motion to dismiss a piercing the corporate veil claim where the plaintiff alleged lack of corporate formalities, commingling of funds, and self-dealing); *Forum Ins. Co. v. Texarkoma Transp. Co.,* 229 A.D.2d 341, 342 (App. Div. 1st Dept. 1996) ("Under New York law, the corporate veil can be pierced where there has been, inter alia, a failure to adhere to corporate formalities, inadequate capitalization, use of corporate funds for personal purpose, overlap in ownership and directorship, or common use of office space and equipment.").

In *Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.,* 933 F.2d 131, 138 (2d Cir. 1991), the Second Circuit explained:

> [W]hen a corporation is used by an individual to accomplish his own and not the corporation's business, such a controlling shareholder may be held liable for the corporation's commercial dealings as well as for its negligent acts.   Where there is proof that defendants were doing business in their individual capacities to suit their own ends—shuttling their own funds in and out without regard to the corporation's form—this sort of activity exceeds the limits of the privilege

93

> of doing business in a corporate form and warrants the imposition of liability on individual stockholders.   The critical question is whether the corporation is a "shell" being used by the individual shareowners to advance their own "purely personal rather than corporate ends."

*Id.* (citations omitted).   *See also Itel Containers Int'l Corp. v. Atlanttrafik Exp. Serv. Ltd.,* 909 F.2d 698, 703 (2d Cir.1990) ("New York law allows the corporate veil to be pierced *either* when there is fraud or when the corporation has been used as an alter ego.").

The court in *Wm. Passalacqua Builders* set forth ten factors courts should consider when determining whether to disregard the corporate structure:

> (1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, i.e., issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own.

*Wm. Passalacqua Builders,* 933 F.2d at 139.   The court found there was enough evidence to go to trial on a piercing the corporate veil claim where a family's real estate business, which consisted of various partnerships and corporations all controlled by family members, did not establish or maintain corporate indicia; did not issue shares timely; had no employees except its officers, which were the same across corporations; did not hold regular meetings; did not elect officers and directors; did not deal at arms' length with each other; shared staff office space for all corporations; and where the lines of corporate control were often blurred, though they did maintain separate books and bank accounts and filed separate tax returns.

94

In this case, the evidence sufficiently supports a finding that the corporate structure among MBM Development, MBM Entertainment, Altria and M&M may be disregarded, and the Debtors and M&M may be considered jointly liable for each other's obligations to Davis.   Moussa and Morad fully controlled and owned (along with Farzaneh, who was a silent partner) the three Debtors and M&M at all times.   The Debtors all shared a common office with Morad and Moussa (and all of their other business entities, including M&M) and they made use of Moussa and Morad's only employee, Mr. Mojica.   There were no separate operating agreements for any of the Debtors or for M&M, and Moussa had difficulty recalling whether he was in fact a member and/or owner of various companies at various points in time.   The Debtors had no employees and it does not appear that they elected officers or directors.

Furthermore, the Defendants submitted into evidence a schedule of payments made to the mortgage companies, Davis and Baku pursuant to the agreements.   *See* Defendants' Exhibit S.   It shows that contractual payments to Davis under the contracts regarding the Clinton Property were made at various times by M&M, MBM, and/or Altria itself.   The payment history reflects no effort to distinguish among obligations that might be owed by one such entity as opposed to another.

It is not necessary to decide whether the separate identities of the Debtors should be disregarded for all purposes and from the perspectives of all creditors.   However, the evidence shows that it is appropriate to disregard the separate existence of each of the Debtors and M&M insofar as they owed obligations to Davis, and to consider the Debtors and M&M to be jointly liable for the remaining contractual obligations owed to Davis as set forth in this Opinion.

95

### K.    Defendants' Counterclaims for Fraud

Defendants allege that Davis made misrepresentations in the April 19 Agreement and the April 20 Agreement as to the condition of the relevant properties, the existence of violations, the existence of the Rahim Action and the existence of the IRS lien.   However, those misrepresentations were set forth in the parties' contracts, and so any claim by Defendants is limited to a claim for breach of contract rather than fraud.   *See Demetre v. HMS Holdings Corp.,* 127 A.D.3d 493 (App. Div. 1st Dept. 2015) (finding the court properly dismissed a fraud claim as duplicative of a breach of contract claim where the plaintiffs only alleged that the defendant made a misrepresentation as to its intent to perform the contract when made); *Biberaj v. Acocella,* 120 A.D.3d 1285 (App. Div. 2nd Dept. 2014).

In addition, M&M elected not to terminate the April 19 Agreement and the April 20 Agreement on the basis of the alleged misrepresentations, and instead entered into a series of contracts that specified exactly how such matters would be dealt with among the parties.   Thus, M&M agreed in the May 6 Agreement that certain amounts would be held aside until the Rahim Action was resolved and the IRS tax lien were resolved.   The IRS tax lien was then resolved when provision was made for it in connection with the August 15 closing and the August 15 transfer of the deed for the Clinton Property.   The problems posed by the Rahim Action were then resolved by stipulation on September 12, 2005, and thereafter the effects of all these circumstances on the parties' obligations (in connection with transfers of the properties) were resolved in an agreed accounting dated September 30, 2005.   In the September 30 Agreement the parties acknowledged that the accounting set forth therein had resolved all issues in connection with the property transfers and that the only issues remaining were those related to Davis's share in Net Proceeds for

96

the Clinton Property.   The parties further agreed in the February 2006 Buyout Agreement that the buyout reflected therein would supersede all prior agreements of the parties and that the parties had no other claims against each other except those relating to the payment obligations set forth in the February 2006 Buyout Agreement itself.

For all of these reasons, any claim by Defendants for damages due to fraud is foreclosed and is of no merit.

### L.    Defendants' Counterclaims for Breach of Contract

For similar reasons there is no merit to Defendants' claims for breach of contract.   The largest of Defendants' claims is that Davis allegedly was obligated to repay the entire mortgages for the Gates Property, the Harlem Property and the Clinton Property, and that she should be required to reimburse the Defendants for the amounts they paid to discharge those mortgages. However, the Court has rejected Defendants' contentions regarding Davis's alleged contractual obligations with respect to the mortgages for the Gates Property and the Harlem Property and the Court has found that Davis's obligations for those mortgages ended when she transferred the properties.   As to the Clinton Mortgage, the parties entered into a comprehensive accounting that resolved all then-outstanding issues among them as of September 30, 2005, and then entered into another agreement in February 2006 that by its terms superseded all prior agreements and acknowledged that the parties had no claims against each other except for claims to the payments set forth in the February 2006 Buyout Agreement.   In fact, after the February 2006 Buyout Agreement, Altria executed a separate letter reassuring Davis that Altria would satisfy the outstanding mortgages on the Clinton Property.   *See* Defendants' Exhibit Z.   These agreements bar any claim by Defendants for breach of contract with respect to the mortgages.

97

Defendants also have claimed that Davis owes damages with respect to amounts paid to deal with outstanding violations, but there was no evidence sufficient to identify particular expenses or damages that were incurred in this regard.   In any event, the accounting reflected in the September 30 Agreement, and the parties' agreement in February 2006 that they had no other claims against each other except in connection with the February 2006 Buyout Agreement, precludes these damage claims.

### M.    The Alleged Agreement Regarding Hip Pop Beverages

Defendants argued at trial that in June 2007 Davis agreed orally to exchange her rights to remaining payments for an interest in the Hip Pop Beverages venture.   The Court has found as a factual matter that no such agreement was made.   In addition, Moussa testified that he contemplated that the agreement would only be binding when a written agreement was prepared and signed, and no such written agreement was signed.   Where the parties contemplate that they will not be bound until a written agreement is signed, an alleged oral agreement cannot be enforced.   *See Ciaramella v. Reader's Digest Ass'n, Inc.*, 131 F.3d 320, 322 (2d Cir. 1997); *Jim Bouton Corp. v. WM. Wrigley Jr. Co.*, 902 F.2d 1074, 1081 (2d Cir. 1990).

### N.    Defendants' Claims for Damages by Wrongful Occupancy

Davis has been living in a duplex apartment at the Clinton Property rent-free since July 2012, and she has leased units in the building to others under the name of Altria.   The Court has found that Davis had no right to occupy the premises, to lease apartments to others, or to withhold rents from the Defendants.   The evidence of damages offered by Defendants was relatively weak; the only evidence of the rental values of the apartments was the testimony of Moussa, and no evidence was offered as to other tenants who could have been placed in the apartments in lieu of

the tenants Davis had installed.   However, Davis offered no contrary evidence of her own.   The

Court has found that the value of the apartment occupied by Davis is $3,800 per month beginning

July 1, 2012, and that Davis owes additional damages in the amount of $1,900 per month

beginning September 1, 2012 for the other apartment over which she has wrongly exercised

dominion and control.   Damages attributable to the period from July 1, 2012 through April 2014

belong to Morad and Farzaneh, who owned the Clinton Property at that time, and damages for the

remainder of the relevant damage period are owed to Altria.   Accordingly, Altria is entitled to a

claim of $74,100 plus an additional $5,700 per month for each month from and after June 1, 2014

until Davis relinquishes full possession and control of all units in the Clinton Property to Altria.

Farzaneh and Morad jointly are entitled to a claim against Davis of $121,600.   Interest should

accrue with respect to each monthly payment from and after the first date of the month to which

such payment is relevant.

### O.    Prejudgment Interest

The calculation of prejudgment interest raises a number of questions, including: (1)

whether interest should be calculated based on the 9% rate set forth in the New York Civil Practice

Law and Rules (which would have applied in the state court lawsuits in the absence of their

removal to this Court) or instead should be calculated at the much lower federal judgment rate; (2)

whether there are any circumstances that would justify a suspension in the calculation of

prejudgment interest; and (3) the effects of the Debtors' bankruptcy filing on the accrual of

prejudgment interest.   The parties have not briefed these issues and the Court will give them an

opportunity to do so before entering judgment.   The Court will issue a separate scheduling Order

setting forth dates for the submission of further points and authorities on these issues and also

scheduling a hearing on Confirmation on the Debtors' proposed plan of reorganization.

Dated: New York, New York
     May 27, 2015

           **<u>s/Michael E. Wiles</u>**
           UNITED STATES BANKRUPTCY JUDGE